RECEIVED IN CLERK'S OFFICE
U.S.D.C. Atlanta

NOV 30 2018

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| ███████████ ) | COMPLAINT |
| ) | |
| ) | |
| Plaintiff, ) | **1 18-CV-5482** |
| ) | |
| v. ) | CIVIL NO.: |
| ) | |
| INTERNET CORPORATION FOR ASSIGNED NAMES ) | |
| AND NUMBERS, INC. ) | |
| and ) | |
| VERISIGN, INC. ) | |
| ) | |
| Defendants. ) | Nov. 29, 2018 |
| ) | |

## COMPLAINT

Plaintiff ███████████ on behalf of the United States of America,

brings this complaint against Defendants INTERNET CORPORATION FOR ASSIGNED

NAMES AND NUMBERS, INC.; and VERISIGN, INC. states as follows:

### Introduction

1. This is an action under the False Claims Act, 31 U.S.C. §3729(a)(1), to reimburse the

   United States Government ("U.S.G.") for approximately $580,505,563.00 in

   unauthorized fees and net proceeds (hereinafter "fees") collected by Defendant

   Internet Corporation for Assigned Names and Numbers, Inc. ("ICANN"), aided by

   Defendant ICANN's alleged co-conspirator Verisign, Inc. ("Verisign"), in the largest

   generic Top-Level Domain ("gTLD"; e.g., .com, .net, .org) application program in the

   history of the Internet, known as "The New gTLD Program", and to remedy the

   effects of their past unlawful conduct.

2. Defendants ICANN and Verisign, through their contractual relationship with the U.S.G., have operated the critical infrastructure asset that is mainly responsible for the Internet as we know it today—the Domain Name System ("DNS")—since 1998. Prior to that time, principals of Defendant ICANN overtly conspired to gain authoritative rights over the Internet free from U.S.G. control beginning approximately in 1988. Utilizing falsified historical accounts, general subterfuge and fraud to display apparent authority over critical asset functions (referred to as the Internet Assigned Numbers Authority ("IANA") functions), principals of Defendant ICANN acquired actual authority to oversee part of the DNS and charge fees for applicants for gTLDs beginning in 2000. Defendant Verisign, who operates the largest gTLDs (.com & .net) through its agreements with ICANN, was a necessary party for Defendant ICANN to award gTLDs under The New gTLD Program as Defendant Verisign was the U.S.G. primary contractor responsible for adding gTLDs to the authoritative DNS root zone until 2016, when the controlling U.S.G. cooperative agreement (the "Verisign Cooperative Agreement") was amended to collaboratively include Defendant ICANN in the management of changes to the Internet's single authoritative root zone—from where the Internet is derived. The malfeasance by Defendants ICANN and Verisign has not only resulted in misappropriated monetary gains, but has culminated in the final stages of transition of the Internet from U.S.G. control to Defendant ICANN (the "IANA Stewardship Transition").

3. Since 1997, the National Telecommunications and Information Administration ("NTIA") under the Department of Commerce ("DOC") has been the executive

branch agency that has managed federal contracts overseeing the DNS and the IANA Stewardship Transition. The NTIA relied upon fallacious historical documents and intentional misrepresentations by Defendant ICANN when the NTIA awarded the IANA Functions Contract to ICANN. But-for Defendant ICANN's general subterfuge, the substantive damages within this complaint would not have accrued. As such, this action further seeks to enjoin the IANA Stewardship Transition and the transfer of the Internet from U.S.G. control to Defendant ICANN via an injunction against the termination of Federal Contract No. SA1301-12-CN-0035, also known as the IANA Functions Contract, and an injunction against the termination of Cooperative Agreement No. NCR-92-18742, also known as the Verisign Cooperative Agreement.

<u>*Background: Formation of the Internet, Internet Governance, and the DNS*</u>

4. Beginning in February 1966, the United States Department of Defense's ("DOD") Advanced Research Projects Agency ("ARPA"), through its Information Processing Techniques Office ("IPTO"), allocated funds for the development of a computer networking project later named ARPANET (the precursor to the modern-day Internet).[1] From approximately October 29, 1969—when the first message was sent from computer-to-computer—to December 31, 1982, the ARPANET was cumbersome to use and only connected between 200-250 people globally. This changed on January 1, 1983, when the protocol used by ARPANET was transitioned to the Transmission Control Protocol ("TCP") and the Internet Protocol

---

[1] *See, e.g.*, *ARPANET and the Origins of the Internet*, DEF. ADVANCED RES. PROJECTS AGENCY, http://www.darpa.mil/about-us/timeline/arpanet (last visited Apr. 22, 2018) ("[ARPANET's] initial demonstration in 1969 led to the Internet . . . .").

("IP") (commonly referred to jointly as "TCP/IP") that was similarly created at the direction of ARPA,[2] ushering in the Internet era.

5. During the ARPANET years, each computer on the network had its own file (known as the "hosts.txt" file) that held the addresses of all the other computers on the network. In order for a new computer to be added to the network, that computer's owner needed to telephone the individual required to maintain the master hosts.txt file, Jon Postel, and ask to be added to the ARPANET. That computer would then be assigned a block of numbers (i.e., an address), and the master hosts.txt file was updated with the name and address of that computer. It was then the responsibility of each computer owner on the network to update their hosts.txt file, so that they could connect to the newly added network computer.

> "The authoritative *hosts.txt* file was maintained on a Hostname Server by the Network Information Center of the Defense Data Network (DDN-NIC), operated by the private company, Stanford Research Institute (SRI) in Menlo, Park, California, under contract to the Defense Communications Agency."[3]

6. Prior to the transition from the ARPANET to the Internet in 1983, it was noted as early as September 1981 that the manual nature of adding new computers to the Internet was not sustainable,[4] and in August 1982 the basic concepts of the DNS

---

[2] *E.g.*, *Foundation of TCP/IP*, Def. Advanced Res. Projects Agency, https://www.darpa.mil/about-us/timeline/tcp-ip (last visited Apr. 22, 2018).

[3] Milton L. Mueller, Ruling the Root: Internet Governance and the Taming of Cyberspace 77 (2002).

[4] RFC 799, Network Working Group, *Internet Domain Names* (Sept. 1981), *available at* https://tools.ietf.org/html/rfc799 (last visited Apr. 22, 2018).

were published.[5] The DNS is essentially a large address book that translates
domain names into numerical IP addresses necessary for locating and identifying
computer services and devices—allowing Internet Users to memorize and input
alphanumeric addresses (e.g., http://Google.com) instead of their numerical
counterparts (e.g., http://172.217.7.4)—enabling the practicable usability of all Top-
Level Domains ("TLDs").[6] Once the transition to TCP/IP occurred, the Internet
began growing at an exponential rate necessitating the creation of the DNS.[7] As
such, a DNS rollout plan, specifications and implementation software were
developed in 1983—the same year that TCP/IP was instantiated; these plans were
created by Paul V. Mockapetris and Jon Postel.[8]

7. Ultimately referred to as the "God of the Internet,"[9] Postel not only created the DNS

   rollout plan, but also chose the initial TLDs (i.e., .com, .org, .edu, .gov, .mil).[10]

---

[5] RFC 819, NETWORK WORKING GROUP, *The Domain Naming Convention for Internet User
Applications* (Aug. 1982), *available at* http://wsm.mxhosting.pl/rfc/rfc819.html (last visited Apr.
20, 2018).

[6] *See, e.g.*, Request for Comments on the Internet Assigned Numbers Authority (IANA)
Functions, 76 Fed. Reg. 10,569 (Feb. 25, 2011).

[7] *See, e.g.*, RFC 1296, NETWORK WORKING GROUP, *Internet Growth (1981-1991)* (Jan. 1992),
*available at* https://tools.ietf.org/html/rfc1296 (last visited Apr. 23, 2018).

[8] RFC 881, NETWORK WORKING GROUP, *The Domain Names Plan and Schedule* (Nov. 1983),
*available at* http://tools.ietf.org/html/rfc881 (last visited Apr. 21, 2018) (stating the planned
schedule for implementation of the DNS); *and* RFC 882, NETWORK WORKING GROUP, *Domain
Names—Concepts and Facilities* (Nov. 1983), *available at* http://wsm.mxhosting.pl/rfc/
rfc882.html (last visited Apr. 28, 2017) (stating the conceptual framework of the DNS); *and* RFC
883, NETWORK WORKING GROUP, *Domain Names—Implementation and Specification* (Nov.
1983), *available at* http://wsm.mxhosting.pl/rfc/rfc883.html (last visited Apr. 21, 2018) (stating
implementation procedures for the DNS).

[9] Postel disputes: the Internet.(suggest by Jon Postel to change Internet domain names creates
controversy), THE ECONOMIST, Feb. 8, 1997 ("...if the Net does have a god he is probably Jon
Postel"); *see also* 'God of the Internet' is dead, BBC NEWS, Oct. 19, 1998, *available at* http://
news.bbc.co.uk/2/hi/science/nature/196487.stm (last visited Apr. 21, 2018).

[10] RFC 920, NETWORK WORKING GROUP, *Domain Requirements* (October 1984) *available at*
http://tools.ietf.org/html/rfc920 (last visited Apr. 21, 2018).

Attending the University of California Los Angeles ("UCLA") as a postgraduate student in 1969, Postel worked alongside Vinton ("Vint") G. Cerf and Stephen D. Crocker. Cerf is known as the "Godfather of the Internet"[11] and Crocker is known as the creator of the Internet's technology community's unofficial authoritative documentation series, Request For Comments ("RFCs").[12] Postel became the RFC Editor in 1970 and retained that position as the overseer of the guiding documentation of the Internet technology community until his death in 1998.[13]

8. Beginning around March 1972, Postel and Cerf formed a subcommittee of the Internet technology community (hereinafter the "RFC Community") (referred to in the RFCs as the "Network Working Group") called the "Network Measurement Group"; publishing their first joint RFC on March 26 entitled *Well Known Socket Numbers* (socket numbers were the precursor to modern-day IP addresses).[14] On May 30, 1972, Postel then proposes himself to be the "czar" of socket numbers via RFC, while stating the duties of said position and "further suggest[ing] . . . the initial allocation" of socket numbers.[15] On December 22, 1982, Postel self-proclaimed

---

[11] Bobbie Johnson, Vint Cerf, aka the godfather of the net, predicts the end of TV as we know it: Web guru foresees download revolution, THE GUARDIAN (Aug. 26, 2007), *available at* https://www.theguardian.com/technology/2007/aug/27/news.google (last visited Apr. 20, 2018). Cerf is also regarded as a "father of the Internet." *E.g.*, Internet Hall of Fame Pioneer—Vint Cerf, Internet Hall of Fame (2012), https://internethalloffame.org/inductees/vint-cerf (last visited Apr. 21, 2018) ("Widely known as a 'Father of the Internet'").

[12] *E.g.*, Stephen D. Crocker, How the Internet Got Its Rules, THE N.Y. TIMES (Apr. 6, 2009), *available at* https://www.nytimes.com/2009/04/07/opinion/07crocker.html?r=1&em (last visited Apr. 22, 2018).

[13] *See, e.g.*, RFC 2555, NETWORK WORKING GROUP, *30 Years of RFCs* (Apr. 7, 1999), *available at* https://www.ietf.org/rfc/rfc2555.txt (last visited Apr. 22, 2018).

[14] RFC 322, NETWORK WORKING GROUP, *Well Known Socket Numbers* (Mar. 26, 1972), *available at* https://www.tools.ietf.org/html/rfc322 (last visited Apr. 22, 2018).

[15] RFC 349, NETWORK WORKING GROUP, *Proposed Standard Socket Numbers* (May 30, 1972), *available at* https://tools.ietf.org/html/rfc349 (last visited Apr. 22, 2018).

himself the "czar of socket numbers" and no longer suggested socket number allocation, but "established the . . . assignments for socket numbers" himself.[16]

9.  In 1973, the Defense Advanced Research Projects Agency ("DARPA"; formerly ARPA) program manager over the IPTO, Robert ("Bob") Kahn, asked Vint Cerf, who was working at Stanford University, to collaborate on a project to develop new communications protocols for the ARPANET.[17] This relationship was memorialized in a DARPA-Stanford University contract. *Id.*, at 8. In May 1974, Cerf, on behalf of Stanford, published *An Assessment of ARPANET Protocols*[18] and in December 1974 he published a specification for TCP (which included both the TCP and IP protocols at that time), thanking Postel for his contribution.[19]

10. While Cerf and Kahn are credited as the architects of TCP/IP, it can not be overstated how closely Cerf worked with Postel on the protocols in the years prior to their deployment on the ARPANET. As Cerf noted,

> "only a few researchers [including Postel] worked to develop and test versions of the internet protocols. Over time, the size of this activity increased until, in 1979, it was necessary to form an informal committee to guide the technical evolution of the protocol suite. The group was called the Internet Configuration Control Board

---

[16] RFC 433, NETWORK WORKING GROUP, *Socket Number List* (Dec. 22, 1972), *available at* https://tools.ietf.org/html/rfc433 (last visited Apr. 22, 2018).

[17] VINTON G. CERF, DAVID D. CLARK, ROBERT E. KAHN, BARRY M. LEINER, DANIEL C. LYNCH, JON POSTEL, LARRY G. ROBERTS & STEPHEN WOLFF, BRIEF HISTORY OF THE INTERNET 6 (1997).

[18] RFC 635, NETWORK WORKING GROUP, *An Assessment of ARPANET Protocols* (May 1974), *available at* https://tools.ietf.org/html/rfc635 (last visited Apr. 22, 2018).

[19] RFC 675, NETWORK WORKING GROUP, *Specification of Internet Transmission Control Program* (Dec. 1974), *available at* https://tools.ietf.org/html/rfc675 (last visited Apr. 22, 2018).

(ICCB) and was established by Dr. Vinton Cerf who was then the DARPA program manager for the effort."[20]

During the period of the ICCB from 1979-83, Postel prepared the official documentation for the DOD Standard Internet Protocol,[21] the Internet Protocol Handbook,[22] the DOD Standard Transmission Control Protocol,[23] and the DARPA Internet Program Protocol Specification,[24] to name a few. Additionally, during this time, Postel led the refined development of the Internet Message Protocol, which described the use case of modern day video conferencing and mass media capabilities;[25] Simple Mail Transfer Protocol ("SMTP"),[26] which is still the standard protocol used in emailing applications; and the Domain Naming Convention for

---

[20] RFC 1160, NETWORK WORKING GROUP, *The Internet Activities Board* 1-2 (May 1990), *available at* https://www.ietf.org/rfc/rfc1160.txt (last visited Nov. 30, 2018) (drafted by Vint Cerf).

[21] RFC 760, NETWORK WORKING GROUP, *DoD Standard Internet Protocol* (Jan. 1980), *available at* https://tools.ietf.org/html/rfc760 (last visited Apr. 22, 2018).

[22] RFC 774, NETWORK WORKING GROUP, *Internet Protocol Handbook* (Oct. 1980), *available at* https://tools.ieft.org/html/rfc774 (last visited Apr. 22, 2018).

[23] RFC 761, NETWORK WORKING GROUP, *DoD Standard Transmission Control Protocol* (Jan. 1980), *available at* https://tools.ietf.org/html/rfc761 (last visited Apr. 22, 2018).

[24] RFC 791, DEF. ADVANCED RES. PROJECTS AGENCY, *Internet Protocol: DARPA Internet Program Protocol Specification* (Sept. 1981), *available at* https://tools.ietf.org/html/rfc791 (last visited Apr. 22, 2018).

[25] *See* RFC 759, NETWORK WORKING GROUP, *Internet Message Protocol* (Aug. 1980), *available at* https://tools.ietf.org/html/rfc759 (last visited Apr. 22, 2018).

[26] RFC 821, NETWORK WORKING GROUP, *Simple Mail Transfer Protocol* (Aug. 1982), *available at* https://tools.ietf.org/html/rfc821 (last visited Apr. 22, 2018).

Internet User Applications.[27] Suffice it to say that throughout this period Postel and

Cerf were keenly aware of the broad implications of the Internet.[28]

11. Upon deployment of the new protocols on January 1, 1983—transitioning the

APRANET to the Internet—there was an immediate doubling in size of the Internet

within the first 6 months,[29] providing objective evidence of its inevitable success

and the ICCB members—including Cerf, Postel and Crocker, *supra* §6—took "the

first step in the formation of a governance hierarchy" in order "to maintain their

position as stewards of the Net." *Supra* note 3, at 89-90.

> "Late that year, the ICCB was reorganized by Dr. Barry
> Leiner, Cerf's successor at DARPA, around a series of task
> forces considering different technical aspects of
> internetting. The re-organized group was named the Internet
> Activities Board [("IAB")]." *Supra* note 20, at 2.

Despite Cerf's assertions to the contrary after 1987, *see, e.g., infra* §15, the

ICCB/IAB was initially organized under DARPA authority to work on DARPA

protocols for the ARPANET, as evidenced by Cerf's DARPA successor's ability to

reorganize and rename the committee.

---

[27] RFC 819, NETWORK WORKING GROUP, *The Domain Naming Convention for Internet User Applications* (Aug. 1982), *available at* https://tools.ietf.org/html/rfc819 (last visited Apr. 22, 2018).

[28] *See, e.g.*, RFC 771, NETWORK WORKING GROUP, *Mail Transition Plan* 1 (Sept. 1980), *available at* https://tools.ietf.org/html/rfc771 (last visited Apr. 22, 2018) (Postel and Cerf as joint authors note that "transition[ing] from the old ARPANET protocols to the new Internet protocols" will enable connections of a diverse array of networks including "the ARPANET, Packet Radio nets, Satellite nets, and local nets . . . .").

[29] *See, e.g., supra* note 7.

On the IAB, Postel was the "defacto Internet standards process" and the "IAB [merely] served as his reviewing team."[30]

### Background: Historical Context of Contracts Governing the DNS— (i) Verisign Cooperative Agreement and (ii) IANA Functions Contract

12. Prior to deployment of the DNS in 1985,[31] little thought was given to the institutions that would maintain the DNS and administer IP addresses, *supra* note 3, at 81, as Postel had historically held this role. Given Postel's overseeing of the definition of new gTLDs, protected TLDs (e.g., .mil for the military) and country-code TLDs ("ccTLDs"; e.g., .us for the United States), it was believed by the RFC Community that Postel—and therefore the Information Sciences Institute ("ISI") at the University of Southern California ("USC") where Postel worked from 1976 until his death in 1998—had "policy authority over name and number assignment." *Id.* However, any authority held by Postel or ISI stemmed from a DARPA-ISI contract that listed Postel as the principal investigator and included assignment, and other functions including RFC Editor. *E.g.*, *id.*

13. Operational authority over the DNS rested with SRI who had maintained the authoritative hosts.txt file since 1971,[32] performed under the DDN-NIC contract,

---

[30] *Supra* note 3, at 90 (quoting Dr. Craig Partridge, Internet Hall of Famee inductee). Biography of Dr. Partridge, *available at* https://www.internethalloffame.org/inductees/craig-partridge (last visited Apr. 22, 2018).

[31] *See, e.g.*, RFC 921, NETWORK WORKING GROUP, *Domain Name System Implementation Schedule—Revised* (Oct. 1984), *available at* https://tools.ietf.org/html/rfc921 (last visited Apr. 22, 2018).

[32] *See, e.g.*, *Domain Names & the Network Information Center*, SRI INT'L, https://www.sri.com/work/timeline-innovation/timeline.php?timeline=business-entertainment#!&innovation=domain-names-network-information-center (last visited Apr. 23, 2018) ("As early as 1971, one of the NIC's assignments was to maintain and administer host tables for the [ARPANET]. Later, the NIC also administered Internet Protocol (IP) addresses.").

making SRI the "registrar of top-level and second-level domains, as well as administrator of the root domain name servers." *Supra* note 3, at 81-82.

14. Any counterarguments to the U.S.G. having complete dominion over the DNS were put to rest in 1987. Under then standing DOD policy, "[o]nce a new system was no longer experimental, control was routinely transferred away from researchers to a military agency and put to practical use. The military agency might then contract with a private firm to perform various functions." *Id*. at 82. Accordingly, "[i]n November 1987, SRI's DDN-NIC . . . took over the IP address assignment and registry function from Postel . . . at ISI," *id*., stating in pertinent part:

> "The responsibility for the assignment of IP numbers and ASNs [("Autonomous System Numbers")] has been assumed by Postmaster at the DDN Network Information Center [(DDN-NIC)]. The Postmaster staff are indebted to Dr. Jon Postel and Ms. Joyce Reynolds of the Information Sciences Institute [(ISI)] at the University of Southern California [(USC)] for their ongoing assistance."[33]

Apparently, at this time via the aforementioned RFC publication, the DARPA-ISI "policy authority," *supra* §11, or actual authority over DNS number assignments was assumed by the DDN-NIC. This ended Postel's uninterrupted 18 years of control over the authoritative zone of the Internet, and seemingly ushered in a spirited campaign to gain its control—free from U.S.G. interference—that is still at issue today.

---

[33] RFC 1020, NETWORK WORKING GROUP, *Internet Numbers* (Nov. 1987), *available at* https://tools.ietf.org/html/rfc1020 (last visited Apr. 22, 2018).

### A. *Retroactive Manipulation of Internet Governance via RFC Pronouncement*

15. While it is unclear how or when exactly Postel resumed his assignment functions,

    the following year, 1988, marks the first mention of the IANA.[34] In RFC 1083, written

    by Postel under the auspices of the IAB,[35] a single sentence proclaimed that not

    only did IANA have authority over IP addresses, as its name suggests, but that it

    was granted said authority by the IAB:

    > "The protocol standards are managed for the IAB by the
    > Internet Assigned Numbers Authority [(IANA)]." *Id*., at 11.

    In an apparent attempt to shroud self-dealing, Postel names his partner at ISI,

    Joyce K. Reynolds, as the IANA point of contact. *Id*., at 10.

    > "A new world was being defined by the RFCs. In that
    > world, the IAB and Postel's assignment function, both
    > established by DARPA, [*supra* §4 & 9,] took on an
    > independent existence." *Supra* note 3, at 93.

16. Over the course of the next 3 years, between December 1988 and April 1991, 7 of

    the 8 RFCs authored by or about the IAB were written by either Cerf or Postel; all of

    which sought to alter the understanding of the RFC Community and secure Internet

    Governance authority with Cerf (via the IAB) and Postel (via the IANA) through

    ultimately consequential acts that were later unknowingly relied upon by the U.S.G.

    *See, e.g.*, *infra* §16.1.2.

---

[34] RFC 1083, NETWORK WORKING GROUP, *IAB Official Protocol Standards* (Dec. 1988), *available at* https://tools.ietf.org/html/rfc1083 (last visited Apr. 23, 2018).

[35] *Id.,* at 12 (naming Jon Postel as the author of the document, however, the document's listed author on the previous 11 pages and within the RFC Index is the Internet Activities Board).

16.1. RFC 1083 (Dec. 1988) marks the first time in IAB's history, which was then chaired by Vint Cerf,[36] that the IAB started publishing "IAB Official Protocol Standards" via RFC. Of the 5 IAB Official Protocol Standards released between December 1988 and April 1991,[37] all 5 were written/edited by Postel, *id.*, and:

16.1.1. *give an illusory appearance of U.S.G. approval* (these RFCs only list the IAB as an author and Postel as a writer or editor, however, within the RFC Index, which is commonly relied upon to access RFCs, DARPA is listed as a joint author);[38]

16.1.2. *list DDN-NIC authority under the IANA's proclaimed role.* Each one of these RFCs have an "Assigned Numbers" section substantially similar to the following:

"**4.1 Assigned Numbers**

This document lists the assigned values of the parameters used in various protocols. For example, IP protocol codes, TCP port numbers, Telenet Option Codes, ARP hardware types, and Terminal Type names.

---

[36] *See, e.g.*, RFC 1120, NETWORK WORKING GROUP, *The Internet Activities Board* (Sept. 1989), *available at* https://tools.ietf.org/html/rfc1120 (last visited Apr. 25, 2018) (stating that Cerf is the Chairman of the IAB).

[37] RFC 1083, *supra* note 34; RFC 1100, NETWORK WORKING GROUP, *IAB Official Protocol Standards* (Apr. 1989), *available at* https://tools.ietf.org/html/rfc1100 (last visited Apr. 25, 2018); RFC 1130, NETWORK WORKING GROUP, *IAB Official Protocol Standards* (Oct. 1989), *available at* https://tools.ietf.org/html/rfc1130 (last visited Apr. 25, 2018); RFC 1140, NETWORK WORKING GROUP, *IAB Official Protocol Standards* (May 1990), *available at* https://tools.ietf.org/html/rfc1140 (last visited Apr. 25, 2018); RFC 1200, NETWORK WORKING GROUP, *IAB Official Protocol Standards* (Apr. 1991), *available at* https://tools.ietf.org/html/rfc1200 (last visited Apr. 25, 2018).

[38] *Compare id., with* RFC Index, https://tools.ietf.org/rfc/index (last visited Apr. 25, 2018) (RFCs 1083, 1100, 1130, 1140 and 1200 list DARPA as a joint author with IAB).

Assigned Numbers was most recently issued as RFC-1010[39].

Another document, Internet Numbers, lists the assigned IP network numbers, and the autonomous system numbers. Internet Numbers was most recently issued as RFC-1062[40]." *Supra* note 34, at §4.1— *Assigned Numbers*.

To an unsophisticated observer, both of the previous paragraphs would fall under their heading "Assigned Numbers"— making the Internet Assigned Numbers Authority (i.e., IANA) the presumptive authoritative body over both those sets of functions, as its name implies to the reasonable observer. However, only upon clicking the links, reading through joined documents, and understanding the intent of both Postel and Cerf, does one discover that the first linked document (e.g., RFC 1010), *see supra* note 39, only pertains to "protocol numbers" and the second linked document (i.e., RFC 1062), *see supra* note 40, pertain to "IP numbers," which were under direct control by the DDN-NIC. *Supra* §13. This was a purposeful, and ultimately successful attempt by Postel and Cerf to use subterfuge to make unsophisticated Congressional and U.S.G. officials rely on their warrants, memorialized in the RFCs, that

---

[39] RFC 1010, NETWORK WORKING GROUP, *Assigned Numbers* (May 1987), *available at* https://tools.ietf.org/html/rfc1010 (last visited Apr. 25, 2018).

[40] RFC 1062, NETWORK WORKING GROUP, *Internet Numbers* (Aug. 1988), *available at* https://tools.ietf.org/html/rfc1062 (last visited Apr. 25, 2018).

> "[t]he Internet Assigned Numbers Authority (IANA) is the overall authority for the IP Addresses, the Domain Names, and many other parameters, used in the Internet."[41];

16.1.3. and, *do not credit the DDN-NIC with any authority over IP addresses*. While the Assigned Numbers section provides a link to a DDN-NIC RFC document, this section solely refers to said document as "[a]nother document" falling under Assigned Numbers, by which IANA would be the presumptive contact. *See, e.g.*, *supra* §16.1.2. Furthermore, within the "Contact" section of the IAB Official Protocol Standards RFCs, Joyce K. Reynolds is designated as the IANA point of contact, and underneath her description, Assigned Numbers are referenced again.[42] Contrarily, under the contact information for the DDN-NIC, the is no reference to any of its IP address duties. *See, e.g.*, *id*.

16.2. Cerf, in September 1989, published the first RFC on "The Internet Activities Board" (RFC 1120) that stated an operational hierarchy of Internet Governance, whereby Cerf—as the IAB chairman—effectively presided over all relevant Internet Governance bodies, and even claimed that the IAB

---

[41] RFC 1591, Network Working Group, *Domain Name System Structure and Delegation* (Mar. 1994), *available at* https://tools.ietf.org/html/rfc1591 (last visited Apr. 25, 2018). This RFC, and others were utilized in a mandated study by Congress, sponsored by the US Department of Commerce and the National Science Foundation. *See, e.g.*, Dubberly Design Office, DNS Concept Map (Aug. 2003), http://www.dubberly.com/concept-maps/domain-name-system (last visited Apr. 25, 2018) (stating that RFCs "document technical and organizational aspects of the Internet," and listing RFC 1591 as one of those pertaining to the DNS).

[42] *Supra* note 34, at 11. Notably, the description states one should refer to two preceding RFCs, "Assigned Numbers" and "Official Internet Protocols", "for further information about the status of protocol documents." This description provides links to those documents, and does not include a link to the DDN-NIC RFC referenced under the Assigned Numbers section.

presided over the authoritative documentation instruments of the Internet

technology community—the RFCs.

> "The IAB performs the following functions:
> 1) Sets Internet Standards,
> 2) Manages the RFC publication process,
> 3) Reviews the operation of the IETF and IRTF,
> 4) Performs strategic planning for the Internet, identifying long-range problems and opportunities,
> 5) Acts as an international technical policy liaison and representative for the Internet community, and
> 6) Resolves technical issues which cannot be rated within the IETF and IRTF frameworks."[43]

The Internet Engineering Task Force ("IETF") and the Internet Research

Task Force ("IRTF") were two of multiple task forces that formed between

1986-87 due to the National Science Foundation ("NSF") increasing funding

to the building of the Internet, and the complex engineering challenges that

brought. *Supra* note 3, at 90-92.

> "In response to the pressing need for near-term Internet technical standards development, one of the original task forces, known as 'Internet Architecture,' evolved into the Internet Engineering Task Force (IETF). Unlike the other task forces, which were limited to invited members, IETF began to hold public meetings four times a year starting in January 1986 . . . . By the fourteenth IETF meeting in July 1989, the IAB/IETF reorganized itself to assume the basic structure that it still retains….The number of task forces was trimmed to two: Internet Engineering and Internet Research (IRTF)." *Id*.

Around the time RFC 1120 was updated in 1990,[44] Cerf began sharing his

idea of holding the "IAB/IETF/IRTF" under an umbrella organization that he

---

[43] RFC 1120, *supra* note 36, at 4.

[44] RFC 1160, *supra* note 20, at 1 ("This is a revision of RFC 1120.").

planned on founding called the "Internet Society" ("ISOC").[45] Cerf eventually

founded the ISOC in 1992 with Bob Kahn (*see supra* §8)[46] and Jon Postel,

who was also the first ISOC individual member and served on its Board of

Trustees from 1993 until his death in 1998.[47] Joyce K. Reynolds, *supra* §14,

was "a Pioneer Member of the ISOC, a . . . member of the Editorial Advisory

Board of ISOC, and . . . Associate Editor of the Internet Society News."[48] The

ISOC currently presides over those aforementioned bodies (IAB (now the

"Internet Architecture Board"), IETF & IRTF) and was instrumental in founding

—with Postel—Defendant ICANN. Cerf chaired Defendant ICANN during the

time the federal cost contract at issue here—Federal Contract No.

SA1301-06-CN-0048—was signed (2006), and Crocker, *supra* §6 & 10,

chaired Defendant ICANN when the fees at issue were collected (2012).[49]

---

[45] *E.g.*, Letter from Vinton G. Cerf to Anthony M. Rutkowski (Nov. 6, 1990 10:05 am EST), *available at* http://web.archive.org/web/20000815072934/https://wia.org/ISOC/901106.htm (last visited Apr. 26, 2018).

[46] *The Internet Society and Internet History,* THE INTERNET SOCIETY, https://www.internetsociety.org/history (last visited Apr. 26, 2018) ("The Internet Society was formed in 1992 by Vint Cerf and Bob Kahn, two of the "Fathers of the Internet".).

[47] *A ten year tribute to Jon Postel: An Internet visionary*, INTERNET SOCIETY, https://www.internetsociety.org/grants-and-awards/postel-service-award/ten-year-tribute-jon-postel/ (last visited Apr. 29, 2018).

[48] ICANN, *Proposal to the U.S. Government to Perform the IANA Function: Response to Request for Quotation Number 40SBNT067020* (Feb. 2, 2000), *available at* https://archive.icann.org/en/general/iana-proposal-02feb00.htm#IA2b (last visited Apr. 29, 2018).

[49] *Compare, e.g., Vinton G. Cerf*, ICANN, https://www.icann.org/resources/pages/vinton-cerf-2014-05-23-en (last visited Apr. 26, 2018) ("Vint Cerf served as chairman of the board of the Internet Corporation for Assigned Names and Numbers (ICANN) from 2000-2007."), *and e.g.*, *Steve Crocker*, ICANN, https://www.icann.org/resources/pages/board-of-directors?user=steve-crocker (last visited Apr. 26, 2018) (stating that Crocker chaired the ICANN Board from June 2011 to November 2017), *with infra* note 96 (executed on Aug. 11, 2006), *and infra* §32 (collection of application fees lasted from January 12, 2012 to May 30, 2012).

17. In order for the IANA to have the authority stated by Postel on behalf of the IAB, *supra* §15 & 16.1, the IAB had to assert counterfactual information that it was a body free from U.S.G. control. Accordingly, Cerf—who formed the precursor to the IAB (i.e., the ICCB) to further the creation of Internet protocols under express federal contracts, while working for DARPA in 1979, *supra* §8-10—began describing the IAB circa 1988 as "an unincorporated, volunteer organization, with support to participating individuals/organizations from the US Government or from the individual's own organization;"[50] a marked contradiction to what Cerf knew to be factually accurate.[51]

Cerf's overt attempt to utilize the RFCs (edited by Postel) to rewrite Postel's historical assignment role; the IAB's history; lay the groundwork for eventual control of the entire Internet free from U.S.G. intervention; and even assert control over the RFCs, and thus dominion over the RFC Community itself, *see supra* §16.2, is further emphasized by his statements in RFC 1174 in 1990.

In RFC 1174, Cerf, on behalf of the IAB, stated to the RFC community that

(i) the IANA has always allocated IP addresses and numeric identifiers since the Internet was created;

(ii) the IANA function is performed directly by the USC's ISI;

(iii) the IANA has the authority to delegate its responsibilities;

(iv) the IANA delegated a portion of authority to an Internet Registry ("IR"); and

---

[50] *Supra* note 45; *see also* RFC 1120, *supra* note 36, at 2 ("The IAB is an independent committee of researchers and professionals with a technical interest in the health and evolution of the Internet system.").

[51] *Compare id.*, and accompanying text, *with supra* note 20, and accompanying text, *and supra* §10 (stating that Cerf's successor at DARPA reorganized and renamed the ICCB to the IAB).

(v) the IR apportioned function is being performed by the DDN-NIC.[52]

RFC 1174 altered the course of the RFC Community's understanding of whom had authority over the Internet. As the RFC Community (i.e., the Internet technology community) regarded the RFCs as "the law," *supra* note 3, at 93-94, RFC 1174 was immediately relied upon as evidenced by the proposal for a Network Coordination Centre ("NCC") by the Réseaux IP Européens ("RIPE")—currently the Regional Internet Registry ("RIR") for Europe, *infra* §20.1—created within a month of RFC 1174's issuance.[53] Internationally, the RFC Community believed, unawarely relayed, and acted upon counterfactual information purported by Cerf and Postel. *E.g.*, *id*. The U.S.G. has been relying upon this counterfactual information for approximately 28 years. Most consequential to Plaintiffs' cause of action, the belief that the IANA

---

[52] RFC 1174, NETWORK WORKING GROUP, *IAB Recommended Policy on Distributing Internet Identifier Assignment and IAB Recommended Policy Change to Internet "Connected" Status* 2 (Aug. 1990), *available at* https://tools.ietf.org/html/rfc1174 (last visited Apr. 23, 2018).

> "Throughout its entire history, the Internet system has employed a central [IANA] for the allocation and assignment of various numeric identifiers needed for the operation of the Internet. The IANA function is performed by USC [ISI]. The IANA has the discretionary authority to delegate portions of this responsibility and, with respect to numeric network and autonomous system identifiers, has lodged this responsibility with an [IR]. This function is performed by SRI International at its Network Information Center (DDN-NIC)."

[53] Daniel Karrenberg, Gerard Ross, Paul Wilson & Leslie Nobile, *Development of the Regional Internet Registry System*, THE INTERNET PROTOCOL J. (Dec. 2001), *available at* https://www.cisco.com/c/en/us/about/press/internet-protocol-journal/back-issues/table-contents-11/regional-internet-registries.html (last visited Apr. 28, 2018) ("The RIPE NCC was to 'function as a 'Delegated Registry' for IP numbers in Europe, as anticipated and defined in RFC 1174'" (quoting RIPE-19, *RIPE Network Coordination Center (RIPE NCC)* (Sept. 16, 1990), *available at* ftp://ftp.ripe.net/ripe/docs/ripe-019.txt (last visited Apr. 28, 2018))).

(an organization in name only, and synonymous with Postel alone[54]) may have authority over the Internet independent of the U.S.G.

18. The U.S.G. was apparently unaware of the impact of Cerf's and Postel's acts on the RFC Community, and continued business as stated underneath U.S.G. contracts as the DOD "decided to open the DDN-NIC contract to new competition in . . . 1991"—awarding a contract that would solely handle domain registrations for the DOD. Government Systems, Inc. won the contract and "simply subcontracted the registry function to a small Virginia-based enterprise named Network Solutions [("NSI")]." NSI was then transferred "most of the services formerly provided by SRI, including hosting and distribution of RFCs and Internet-Drafts, registration of network numbers, and help desk services." NSI "subcontracted with Jon Postel to perform TCP port number assignments." *Supra* note 3, at 101.

19. In 1992, it becomes apparent that the counterfactual, self-dealing statements of Cerf and Postel via the RFCs are relied upon internationally. That reliance ultimately led to the establishment of RIRs, *see infra* §21.1, under the apparent delegable authority of the IANA relayed by Cerf via RFC 1174, *supra* §16(i-v), and may ultimately lead to the concurrent commercial, governmental and technical fragmentation[55] of the Internet—a U.S.G. Critical Infrastructure Information System.

---

[54] *E.g.*, RFC 2468, NETWORK WORKING GROUP, *I Remember IANA* 1 (Oct. 1998), *available at* https://tools.ietf.org/html/rfc2468 (last visited Apr. 23, 2018) (In recognition of Postel's death, Cerf states "Jonathan B. Postel, our Internet Assigned Numbers Authority…" and "Jon, our beloved IANA, is gone.")

[55] *See* VINTON G. CERF, WILLIAM J. DRAKE & WOLFGANG KLEINWÄCHTER, WORLD ECON. F., INTERNET FRAGMENTATION: AN OVERVIEW (Jan. 2016), *available at* https://www.sbs.ox.ac.uk/cybersecurity-capacity/system/files/WEF_FII_Internet_Fragmentation_An_Overview_2016.pdf (last visited Apr. 27, 2018). Internet fragmentation is the splitting of the Internet into a series of cyberspace segments, thus endangering its open connectivity. *See id.*, at 7.

In October 1992, RFC 1366 was published which "propos[ed] a plan which will

forward the implementation of RFC 1174 and which defines the allocation and

assignment of the network number space."[56] RFC 1366 and revisions thereof (RFC

1466 & RFC 2050) were interpreted as setting "global guidelines"[57] and are

principally responsible for the assignment of IP addresses by organizations outside

of the U.S.G.—RIRs, *see infra* §21.1—relying upon the IANA's power to delegate to

an IR, inaccurately stated by Cerf in RFC 1174, *supra* §16(i-v).

> "The distributed regional registry [(RIR)] is empowered by
> the IANA and the IR to provide the network number
> registration function to a geographic area." *Supra* note
> 56, at 3.

This counterfactual information published in the RFCs ultimately led to the

establishment of "The Internet Registry System" whereby an IR hierarchy was

established and the IANA was the hierarchical pinnacle.

> "The Internet Registry hierarchy consists of the following
> levels of hierarchy as seen from the top down: IANA,
> Regional IRs, Local IRs."[58]

Similar to Cerf, Postel—who was an author of the 1996 revision of RFC 1466

embodied in RFC 2050, *id*.—asserted that

> "The Internet Assigned Numbers Authority [(IANA)] has
> authority over all number spaces used in the Internet.
> This includes Internet Address Space. IANA allocates
> parts of the Internet address space to regional IRs
> [(RIRs)] according to its established needs." *Id*., at 3.

---

[56] RFC 1366, NETWORK WORKING GROUP, *Guidelines for Management of IP Address Space* (Oct. 1992), *available at* https://tools.ietf.org/html/rfc1366 (last visited Apr. 27, 2018).

[57] *Supra* note 53.

[58] RFC 2050, NETWORK WORKING GROUP, *Internet Registry IP Allocation Guidelines* 3 (Nov. 1996), *available at* https://tools.ietf.org/html/rfc2050 (last visited Apr. 28, 2018)

Precipitating this disinformation, RFCs were published on behalf of the IANA in

coordination with the IAB stating that

> "RFC 1466 lists the criteria to which Internet registries
> should conform. One of the criteria is that the Internet
> registry is committed to allocate IP numbers according
> to the guidelines established by the IANA and the IR."[59]

This counterfactual information was directly relayed to and relied upon by the

Federal Networking Council ("FNC"), an informal group chartered in 1997 by the

United States National Science and Technology Council's Committee on

Computing, Information and Communications ("CCIC") to act as a forum for

providing inter-federal agency networking coordination and assistance in building

the National Information Infrastructure ("NII"). The FNC consisted of members and

participants from over 25 US Federal agencies,[60] including the Executive Office of

the President of the United States ("EOP") and the National Communications

---

[59] *E.g.*, RFC 1814, NETWORK WORKING GROUP, *Unique Addresses are Good* (June 1995),
*available at* https://tools.ietf.org/html/rfc1814 (last visited Apr. 28, 2018).

[60] Membership consists of agents from NSF, DARPA, DOD, Defense Information Systems
Agency ("DISA"), Department of Energy ("DOE"), Department of Education ("ED"),
Environmental Protection Agency ("EPA"), General Services Administration ("GSA"), National
Aeronautics and Space Administration ("NASA"), National Institutes of Health ("NIH"), National
Institute of Standards of Technology ("NIST"), National Oceanic and Atmospheric
Administration ("NOAA"), National Security Agency ("NSA"), National Telecommunications and
Information Administration ("NTIA"), Agency for International Development ("USAID"), Nuclear
Regulatory Commission ("USNRC"), Geological Survey ("U.S.G.S"), Army Research Laboratory
("ARL"), Ballistic Research Laboratory ("BRL"), Central Intelligence Agency ("CIA"), Defense
Logistics Agency ("DLA"), Department of Agriculture ("DOA"), National Coordination Office
("NCO"), National Communications System ("NCS"), National Security Council ("NSC"), Office
of Management and Budget ("OMB"), the Executive Office of the President of the United States
("EOP"), & Office of Science and Technology Policy ("OSTP").

System ("NCS"), which consisted of 23 member organizations alone.[61] In the late

1980s and 1990s, the FNC was the U.S.G. authoritative body circumscribing the

future direction of the Internet so much so that Cerf revised RFC 1120, *supra* §16.2,

in May 1990, incorporating the FNC; bolstering his apparent authority.[62] The

information disseminated to FNC members was critical in U.S.G. approval of

Defendant ICANN and its role as a U.S.G. contractor.[63]

### (i) *Verisign Cooperative Agreement*

20. In the spring of 1992, the NSF—who was the U.S.G. administrator over the "civilian

internet" (hereinafter "Internet") at this time—solicited bids "to take over key

---

[61] "[T]he NCS was expanded . . . to the current 23 members: Departments of Agriculture, Commerce, Defense, Energy, Health and Human Services, Interior, Justice, State, Transportation, Treasury, Veterans Affairs, Central Intelligence Agency, Federal Communications Commission, Federal Emergency Management Agency, Federal Reserve Board, General Services Administration, The Joint Staff, National Aeronautics and Space Administration, National Security Agency, National Telecommunications and Information Administration, Nuclear Regular Commission, U.S. Information Agency, and U.S. Postal Service." *National Communications System (NCS)*, FED'N OF AM. SCIENTISTS (July 17, 1998), https://fas.org/nuke/guide/usa/c3i/ncs.htm (last visited Apr. 28, 2018).

[62] *Compare* RFC 1120, *supra* note 36, at 2 ("As the Internet expanded, it drew support from U.S. Government organizations including DARPA, [NSF], [DOE] and [NASA]. Key managers in these organizations, responsible for computer networking research and development, formed an informal Federal Research Internet Coordinating Committee (FRICC) to coordinate U.S. Government support for and development and use of the Internet system. The FRICC sponsors most of the U.S. research on internetting, including support for the Internet Activities Board and its subsidiary organizations."), *with* RFC 1160, *supra* note 20, at 2 ("In 1990, the FRICC was reorganized as part of a larger initiative sponsored by the networking subcommittee of the Federal Coordinating Committee on Science, Engineering and Technology (FCCSET). The reorganization created the Federal Networking Council (FNC) and its Working Groups. The membership of the FNC included all the former FRICC members and many other U.S. Government representatives.").

[63] The FNC's definition of the "Internet," and its interpretation thereof, was the guiding authority for Congress. *See, e.g.*, *The Domain Name System: Where Do We Go From Here?: Hearing Before the Subcomm. on Basic Research and Subcomm. on Technology of the H. Comm. on Science*, 105th Cong. (Mar. 31, 1998) (testimony of Robert Kahn on behalf of the Corporation for National Research Initiatives ("CRIN")— "And just for the record, for reference purposes, when I talk about the Internet, I take the definition that the Federal Networking Council's resolution of October 1995 states, which is on the Web at WWW.FNC.GOV. So you might take a look at that, because there has been issue as to what exactly is and what is not the Internet.").

administrative functions for the civilian Internet." *Supra* note 3, at 101. NSF

ultimately awarded three separate awards to three separate organizations in the

delineated "areas of (i) Registration Services, (ii) Directory and Database Services,

and (iii) Information Services" via cooperative agreements on or around

January 1, 1993.[64] NSI was awarded the cooperative agreement for Registration

Services, based upon its proposal which expressly including a subcontract with

USC's ISI naming Postel as "IANA manager and chairman of the Advisory panel for

the [NSF-NSI contract]," and "described [Postel's] role as providing 'services as an

employee of USC's Information Sciences Institute (ISI), subcontractor to Network

Solutions.'" *Supra* note 3, at 101. Similar to the rest of the Internet technology

community, but without capitulating to the self-proscribed authority of the IANA,

NSI "also proposed to officially designate RIPE as an Internet registry [(IR)] for

European countries, and noted its commitment to 'foster development of a Pacific/

Asia and other regional counterparts to RIPE.'" *Id.*, at 101-02.

Due to the cancellation of one of the cooperative agreements, the provision of

Registration and Information Services were consolidated, and two organizations

became responsible for the Internet's administration on September 13, 1995.[65]

Verisign—a named defendant—has been the organization responsible for

Registration and Information Services since *June 2000*, via its $19.6B acquisition of

---

[64] Nat'l Sci. Found., Network Information Services Manager(s) for NSFNET and the NREN: INTERNIC Registration Services, Cooperative Agreement No. NCR-9218742, Art. 1 (Jan. 1, 1993), *available at* https://archive.icann.org/en/nsi/coopagmt-01jan93.htm (last visited Apr. 22, 2018).

[65] *Id.* Amend. 4 (Sept. 13, 1995), *available at* https://archive.icann.org/en/nsi/coopagmt-amend4-13sep95.htm (last visited Aug. 17, 2018).

the entity formerly managing that responsibility under via its NSF cooperative agreement—NSI.[66]

21. Under its original cooperative agreement, NSI was responsible for managing all aspects of registration in the DNS.[67] Under the terms of the cooperative agreement with NSF, NSI could delegate certain responsibilities, in which case it delegated to IANA the functions and responsibilities being proclaimed by Cerf and Postel, and recorded in the RFCs. The functions necessary for managing the DNS include:

21.1. *Assignment of numerical addresses to Internet Users*. Every computerized asset (e.g., mobile phones, digital notebooks, computers, databases, etc.) connected to the Internet has a unique IP address. The assignment of these addresses—originally coordinated by NSI via its subcontractor, the IANA— are now

> "allocat[ed] [in] blocks of numerical addresses to regional IP registries [(RIRs)] (ARIN in North America,[68] RIPE in Europe, . . . APNIC in the Asia/ Pacific region [, LACNIC in Latin America and some Caribbean nations, and AFRINIC in

---

[66] *See* Verisign, Inc., Annual Report (Form 10-K) (Mar. 28, 2001), *available at* https:// www.sec.gov/Archives/edgard/data/ 1014473/000101287001001360/0001012870-01-001360-0001.txt (last visited Apr. 17, 2018) ("In June 2000, [Verisign] acquired [NSI], a publicly traded company that provides Internet domain name registration and global registry services for aggregate consideration of approximately $19.6 billion.").

[67] *See supra* note 61, Art. 3(F):
    F.  The Non-military internet registration services to be provided under this agreement will initially include, but not be limited to, the following:
        1.  Domain name registration
        2.  Domain name server registration
        3.  Network number assignment
        4.  Autonomous system number assignment

[68] *Supra* note 61, AMEND. 7 (Dec. 3, 1997), *available at* https://contracts.onecle.com/netsol/ nsf.coop7.1997.12.03.shtml (stating that NSI is to transfer its "IP number assignment" responsibility to The American Registry for Internet Numbers ("ARIN")).

Africa]) . . . . In turn, larger Internet service providers [("ISPs")] apply to the [RIRs] for blocks of IP addresses. The recipients of those address blocks then reassign addresses to smaller [ISPs] and to end users."[69]

21.2. *Management of the system of registering names for Internet Users.*

"The domain name space is constructed as a hierarchy. It is divided into top-level domains (TLDs), with each TLD then divided into second level domains (SLDs), and so on. More than 200 national, or country-code, TLDs (ccTLDs) are administered by their corresponding governments or by private entities with the appropriate national government's acquiescence. A small set of gTLDs do not carry any national identifier, but denote the intended function of that portion of the domain space. For example, .com was established for commercial users, .org for not-for-profit organizations, and .net for network service providers. The registration and propagation of these key gTLDs are performed by NSI . . . ." *Id.*

21.3. *Operation of the root server system.*

"The root server system is a set of thirteen file servers, which together contain authoritative databases listing all TLDs. [Under the cooperative agreement, NSI operated] the "A" root server, which maintains the authoritative root database and replicates changes to the other root servers on a daily basis. Different organizations, including NSI, operate the other 12 root servers . . . . Universal name consistency on the Internet cannot be guaranteed without a set of authoritative and consistent roots. Without such consistency messages could not be routed with any certainty to the intended addresses." *Id.*

---

[69] Management of Internet Names and Addresses, 60 Fed. Reg. 31,741, 31,742 (June 10, 1998), *available at* https://www.gpo.gov/fdsys/pkg/FR-1998-06-10/pdf/98-15392.pdf (last visited Apr. 17, 2018).

21.4. *Protocol Assignment*.

> "The Internet protocol suite, as defined by the Internet Engineering Task Force (IETF), contains many technical parameters, including protocol numbers, port numbers, autonomous system numbers, management information base object identifiers and others. The common use of these protocols by the Internet community requires that the particular values used in these fields be assigned uniquely. [Under the cooperative agreement, NSI's subcontractor,] IANA . . . makes these assignments and maintains a registry of the assigned values." *Id*.

22. On September 13, 1995, NSI's cooperative agreement was amended to allow it to begin charging registration fees for SLDs in TLDs,[70] resulting in a surge of millions of dollars to NSI. This amendment—combined with a series of events and discussions between 1995 and 1998, which are beyond the scope of this complaint—resulted in the U.S.G. proposing to transition management of the DNS to a new private, not-for-profit corporation ("NewCo"). Particularly, the U.S.G. "proposed moving the system for registering [SLDs] and the management of [gTLDs] into a competitive environment by creating two market-driven businesses, registration of [SLDs] and the management of gTLD registries."[71]

22.1. The U.S.G. proposed transition of management of the DNS to NewCo included the distinction between "registries" and "registrars".

> "A 'registry' is responsible for maintaining a TLD's zone files, which contain each second level domain name in that TLD and the corresponding IP addresses of its name servers [(i.e., the

---

[70] *Supra* note 61, Amend. 4 (Sept. 13, 1995), *available at* https://archive.icann.org/en/nsi/coopagmt-amend4-13sep95.htm (last visited Aug. 17, 2018).

[71] *Supra* note 69, at 31,745.

> address book for that TLD)] . . . . A 'registrar' acts
> as an interface between domain-name holders
> and the registry, providing registration and value-
> added services. The registrar submits zone file
> information for each of its customers in a single
> TLD to the registry."[72]

23. Accordingly, on October 7, 1998, the NSI cooperative agreement was amended
such that:[73]

  23.1. NSI was responsible for developing the technical infrastructure that would
  allow multiple registrars to register SLDs within TLDs;

  23.2. NSI was allowed to charge up to $1/SLD registration/year for the registry
  services utilized in the use of this technology;

  23.3. "NSI [was required to] recognize NewCo pursuant to a contract between
  NSI and NewCo";

  23.4. NSI was allowed to continue to operate as the registry and a registrar
  for .com, .net and .org through registry and registrar agreements that would
  be established with NewCo;

  23.5. NSI agreed to continue to administer "the primary root server for the root
  server system and as a root zone administrator until such time as the U.S.G.
  instructs NSI in writing to transfer either or both of these functions to NewCo
  or a specified alternate entity"; and

---

[72] Network Solutions, Inc., Annual Report (Form 10-K) (Mar. 31, 1998), *available at* https://
www.sec.gov/Archives/edgar/data/1030341/0000950133-98-001194.txt (last visited Apr. 17,
2018).

[73] *Supra* note 61, AMEND. 11 (Oct. 7, 1998), *available at* https://www.ntia.doc.gov/files/ntia/
publications/amend11_052206.pdf (last visited Aug. 28, 2018).

23.6. "While NSI continues to operate the primary root server, it shall request written direction from an authorized [U.S.G.] official before making or rejecting any modifications, additions or deletions to the root zone file." *Id.*

24. One week prior, on September 30, 1998, Defendant ICANN—a private, not-for-profit organization primarily founded by the IANA's Jon Postel, who actively worked in that capacity as a U.S.G. contractor since 1971 and was serving as a subcontractor of NSI at this time—was incorporated, after consultation with U.S.G. officials, for the specific purpose to serve as NewCo.[74]

25. On November 25, 1998, the NTIA—an executive agency within DOC appointed to replace NSF in the management of the Internet's cooperative agreements—signed a Memorandum of Understanding ("MoU") with ICANN to provide technical support to provide "assurances that the private sector has the capability and resources to assume the important responsibilities related to the technical management of the DNS," based solely on ICANN's stated business purpose within its Articles of Incorporation.[75]

26. On February 26, 1999, ICANN was formally recognized as NewCo by the NTIA "in the performance of its obligations under the MoU".[76] On November 10, 1999,

---

[74] *See* Internet Corporation for Assigned Names and Numbers, Inc., Articles of Incorporation (Sep. 30, 1998), *available at* https://businesssearch.sos.ca.gov/Document/RetrievePDF (last visited Apr. 17, 2018) (stating that ICANN was being formed to "perform[] and oversee[] functions related to the coordination of the [DNS]").

[75] *See* MEMORANDUM OF UNDERSTANDING BETWEEN THE U.S. DEPARTMENT OF COMMERCE AND INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS (Nov. 25, 1998), *available at* https://www.icann.org/resources/unthemed-pages/icann-mou-1998-11-25-en (last visited Apr. 7, 2018) ("ICANN has the authority to participate… as evidenced in its Articles of Incorporation . . . and Bylaws . . . .").

[76] Letter from J. Beckwith Burr, Acting Assoc. Admin. for Int'l Affairs, NTIA, to David Graves, Dir. of Bus. Affairs, NSI (Feb. 26, 1999).

ICANN officially became NewCo via an amendment to the NSI cooperative agreement expressly warranting NSI's recognition of ICANN as NewCo,[77] as previously stated in the amendment made on October 7, 1998, *supra* §23.3. Under this newly amended NSI cooperative agreement, NSI's sole-dominion over the DNS was split by separating its (i) Registry and Registrar Services from (ii) all the "Other Services" NSI provided under the cooperative agreement, *supra* note 70, at 1, including administration of the authoritative root, *supra* §23.5.

27. Defendant ICANN has operated (i) Registry and Registrar Services for the DNS since November 25, 1998.[78] Defendant Verisign has managed the (ii) Other Services provided by NSI under the cooperative agreement, since its acquisition of NSI in June 2000, *supra* note 66, and accompanying text, including administration of the authoritative root zone.

### (ii) *IANA Functions Contract*

28. On February 9, 2000 the first IANA Functions Contract was effectuated via a bilateral purchase order embodied in DOC Form CD-404; a "Supply, Equipment, or Service Order".[79] This Purchase Order was effectively a no-cost contract, by which the U.S.G. would not incur any costs, and the government contractor, ICANN, was allowed to "collect fees from third parties . . . for the functions performed" upon approval by a Contracting Officer. *Id*., at 2. This purchase order expressly

---

[77] *Supra* note 61, AMEND. 19 (Nov. 10, 1999), *available at* https://www.ntia.doc.gov/files/ntia/publications/amend19_052206.pdf (last visited Aug. 17, 2018).

[78] S*upra* §24-25; *e.g.*, *supra* note 48, at §II(A)(2) ("The [DOC] recognized ICANN as NewCo in a [MOU] entered by DOC and ICANN on November 25, 1998.").

[79] UNITED STATES DEP'T OF COMM., ORDER NO. 40SBNT067020 (Feb. 9, 2000), *available at* https://www.ntia.doc.gov/files/ntia/publications/ianacontract.pdf (last visited Apr. 28, 2018).

incorporates by reference, and by verbatim recitation of suggested provisions,[80] (1) an "ICANN quotation dated February 2, 2000 signed by Micheal M. Roberts [CEO of ICANN]", *supra* note 48; and (2) an "USC/ICANN Transition Agreement by and between [USC] and [ICANN]" ("Transition Agreement"),[81] both of which give unilateral false and conflicting accounts of the IANA's authority, thereby objectively perpetuating fraud in the inducement of the IANA Functions Contract. A few of those false assertions are enumerated below.

(a) *Falsely states that "ICANN has no present plans to charge [user fees or applicant fees]"*. At this time ICANN was proposing a $1 user fee specifically for domain names registered under .com, .org and .net domains,[82] where NSI (acquired by Defendant Verisign in 2000) was the registry operator and registrar under Amendment 11 to the Verisign Cooperative Agreement, *supra* §23.4. Additionally, within 6 months of signing the IANA Functions Contract, ICANN began accepting applications,[83] and application fees (amounting to $2.115M), for new gTLDs, *infra* §29.

---

[80] *Compare supra* note 48, at §I(A)(2)(a) ("ICANN proposes that the following provision be included in the contract: . . . "), *with supra* note 79, at §3.

[81] ICANN, USC/ICANN Transition Agreement, *available at* https://www.icann.org/resources/unthemed-pages/usc-icann-transition-2012-02-25-en (last visited Apr. 28, 2018).

[82] *See, e.g.*, *Governing Cyberspace: ICANN, a Controversial Internet Standards Body*, 3 THE FEDERALIST SOCIETY 2 (Oct. 1, 1999), *available at* https://fedsoc.org/commentary/publications/governing-cyberspace-icann-a-controversial-internet-standards-body (last visited Apr. 29, 2018).

[83] *E.g.*, *The History of Domain Names—Seven New TLDs*, HISTORY OF DOMAIN NAMES, http://www.historyofdomainnames.com/sevennew-tlds/ (last visited Apr. 29, 2018) (stating that ICANN made a call for new gTLD proposals on August 15, 2000).

(b) *Falsely asserts that the IAB has authority over the IANA.* Incorporated by reference, RFC 2450 states "[t]he IAB and IESG [("Internet Engineering Steering Group")] have authorized the [IANA] as the appropriate entity to have the responsibility for the management of the IPv6 address space . . . ."[84] This assertion is directly contradicted by the Transition Agreement, *infra* §28(c), which expressly states that such authority stems from DARPA,[85] and this ICANN quotation itself.[86]

(c) *Misappropriates U.S.G. data rights*. ICANN proposes the approval of the Transition Agreement, and the addition of a clause to the IANA Functions Contract that is inserted verbatim. Under that clause, "the [U.S.G.] hereby approves the acquisition by ICANN of USC's entire right, title and interest in and to the Licensed IP Rights as defined in the Transition Agreement."[87] Under the Transition Agreement, this included the transfer of all intellectual property rights, including trade secrets and patents, within USC's ISI's "computer programs, data, documents, protocols,

---

[84] RFC 2450, NETWORK WORKING GROUP, *Proposed TLA and NLA Assignment Rules* 5 (Dec. 1998), *available at* https://www.ietf.org/rfc/rfc2450.txt (last visited Apr. 29, 2018).

[85] Under Recitals §B, the USC/ICANN Transition Agreement, *supra* note 81, expressly incorporates by reference the "TNT Contract" which is an agreement between DARPA and USC from April 1, 1997 to March 31, 1998 which allowed USC's ISI to "perform[] several Internet coordination and management tasks, such as acting as the Internet Assigned Numbers Authority (IANA) and editing the Internet Request for Comments (RFC) series." DARPA, *Tera-node Network Technology (Task 4): Network Infrastructure Activities (NIA): FINAL REPORT* 2 (July 17, 1999), *available at* https://www.researchgate.net/publication/ 235066125_Tera-node_Network_Technology_TASK_4_Network_Infrastructure_Activities_NIA (last visited Apr. 29, 2018).

[86] *See supra* note 48, at §I(A)(2)(b) ("ICANN proposes to perform the IANA function using personnel, facilities, and intellectual property it has contracted to obtain from the prior contractor, the University of Southern California's Information Sciences Institute (USC-ISI).").

[87] *Compare supra* note 48, at §I(A)(2)(b), *with supra* note 79, at §4(b).

processes and other materials" in the performance of IANA duties since 1976—while Postel worked there and acquired while USC's ISI was a contractor of DARPA.[88] This transfer of U.S.G. intellectual property was committed via fraud in the inducement, as the Transition Agreement appears to solely refer to USC rights, however, the data and documents referred to held intellectual property of the U.S.G. accumulated by USC's ISI while a U.S.G. contractor.

29. By October 2, 2000 ICANN accepted 47 applications from potential gTLD registry operators to instantiate and operate nearly 200 new gTLDs. Each applicant was required to pay an application fee of $50,000 amounting to $2,350,000.00—enlarging ICANN's budget by approximately 50%. Of the nearly 200 new gTLDs applied for, only 7 were selected.[89]

30. On March 21, 2001 a second no-cost IANA Functions Contract was effectuated via GSA Form 347 where no cost would be incurred by the U.S.G., and "the Contractor may establish and collect fees from third parties (i.e., other than the [U.S.G.]) for the functions performed under this purchase order, provided the fee level are approved by the Contracting Officer before going into effect . . . ".[90]

---

[88] *See supra* note 81, at §2.2(a).

[89] *Supra* note 3, at 202-03.

[90] UNITED STATES NAT'L TELECOMM. AND INFO. ADMIN., ORDER FOR SUPPLIES OR SERVICES, ORDER NO. SB1335-01-W-0650 p.3 (Mar. 21, 2001), *available at* https://www.ntia.doc.gov/files/ntia/publications/sb1335-01-w-0650.pdf (last visited Apr. 8, 2018).

31. This language was repeated in a third similar no-cost type IANA Functions Contract ordered on Mar. 13, 2003,[91] under which another round of gTLD applications were accepted. By the end of the application period on March 16, 2004[92] only 10 applications were submitted[93] with an application fee of $45,000 per application[94] amounting to $450,000.00 in fees. Over the course of the next 7 years, 8 of the 10 gTLDs would be approved.[95]

Current Action

32. On August 11, 2006, a fourth IANA Functions Contract was signed between the NTIA and ICANN, however, unlike the contracts before it, this contract was a cost-contract (i.e., not a no-cost similar contract).[96] This contract included in pertinent part that prior to the collection of fees from third-parties by the Contractor (i.e., ICANN), that "the Contractor shall notify the Contracting Officer in writing at least sixty days prior to the fee being applied and provide documentation which identifies the rationale for the fee, the parties to be charged, and the cost basis for the fee.... The Contracting Officer shall approve any fee in writing prior to the Contractor

---

[91] UNITED STATES NAT'L TELECOMM. AND INFO. ADMIN., ORDER FOR SUPPLIES OR SERVICES, ORDER NO. DG1335-03-SE-0336 p.5 (Mar. 13, 2003), *available at* https://www.ntia.doc.gov/files/ntia/publications/ianaorder_03142003.pdf (last visited Apr. 8, 2018).

[92] New sTLD Application, ICANN (Dec. 15, 2003), *available at* https://archive.icann.org/en/tlds/new-stld-rfp/new-stld-application-parta-15dec03.htm (last visited Apr. 29, 2018).

[93] Minutes—Special Meeting of the Board, ICANN (Nov. 15, 2004), *available at* https://www.icann.org/resources/board-material/minutes-2004-11-15-en (last visited Apr. 29, 2018).

[94] *Supra* note 92.

[95] *E.g.*, *Generic Top-Level Domain*, ICANNWIKI, https://icannwiki.org/Generic_top-level_domain (last visited Apr. 29, 2018).

[96] UNITED STATES NAT'L TELECOMM. AND INFO. ADMIN., AWARD/CONTRACT, CONTRACT NO. SA1301-06-CN-0048 p.3 (Aug. 11, 2006), *available at* https://www.ntia.doc.gov/files/ntia/publications/ianacontract_081406.pdf (last visited Apr. 12, 2018).

imposing the fee." *Id.* at §B.1(d). A warranted Contracting Officer never expressly approved of the fees collected by ICANN.

33. From January 12, 2012 through May 30, 2012—ICANN held open an application submission period for a new gTLD application process entitled The New gTLD Program where, similar to the previous gTLD application periods, applicants applied to become the *registry operator*[97] for new gTLDs. The New gTLD Program would prove to be the largest gTLD offering in the history of the Internet with 1,930 application submissions—each with a cost of $185,000 per application. Application fees alone amounted to $357,050,000.00 and to date, approximately 1,230 gTLDs have been added to the authoritative root by Defendant Verisign.[98]

34. Under the application rules, where applicants vied for the same gTLD and met the express qualification criteria, a silent auction was held between those applicants with registry operation being awarded to the highest bidder. To date, these auctions have resulted in the award of 17 gTLDs[99] and auction net proceeds of $233,455,563.00.[100]

35. Neither application fee proceeds nor auction net proceeds were transferred to the U.S.G. as required under Federal Contract No. SA1301-06-CN-0048.

---

[97] "The registry operator is responsible for the technical operation of the TLD, including all of the names registered in that TLD." ICANN, *Preamble—New Generic Top-Level Domains*, https://newgtlds.icann.org/en/about/program (last visited Apr. 6, 2018).

[98] *See* ICANN, New Generic Top-Level Domains, *Program Statistics*, https://newgtlds.icann.org/en/program-status/statistics (last visited Nov. 30, 2018).

[99] ICANN, New Generic Top-Level Domains, *New GLTD Auction Results*, *available at* https://web.archive.org/web/20171207162910/https://gtldresult.icann.org/application-result/applicationstatus/auctionresults (last visited Apr. 12, 2018).

[100] ICANN, New Generic Top-Level Domains, *New GTLD Auction Proceeds*, https://newgtlds.icann.org/en/applicants/auctions/proceeds (last visited Apr. 12, 2018).

36. Defendants ICANN and Verisign have reciprocal interests in both the Verisign Cooperative Agreement and the IANA Functions Contract. Defendants Verisign and ICANN's registry agreement for the .com gTLD—the largest grossing TLD—is an amendment of the Verisign Cooperative Agreement, which has historically made Defendant Verisign the authority over new gTLD additions to the authoritative root zone. On July 6, 2010—during the 0048 contract period—the Verisign Cooperative Agreement was amended to incorporate documents generated by and between Defendants Verisign and ICANN to become joint managers of the authoritative root zone.[101] These same documents were incorporated into the IANA Functions Contract, whereby Defendant Verisign would now be performing the "Root Zone Maintainer" functions in collaboration with Defendant ICANN who would perform the "Root Zone ZSK Operator" functions.[102] The NTIA was made the "Root Zone Administrator" under these agreements, whereby it "performs the authorization for changes to the Root Zone." *Id.*, at §1.3.2.

37. The NTIA has not approved of any of 1,230 new gTLD additions to the authoritative root zone added during the successor to the expiration of 0048—Federal Contract No. SA1301-12-CN-0035, which became effective on October 1, 2012. Defendant ICANN would not be able to successfully add new gTLDs to the authoritative root

[101] *Supra* note 64, AMEND. 31 (July 6, 2010), *available at* https://www.ntia.doc.gov/files/ntia/publications/amendment31_07062010.pdf (last visited May 7, 2018).

[102] *Supra* note 96, MOD. 5 (July 13, 2010), *available at* https://www.ntia.doc.gov/files/ntia/publications/modification5_icann_dnssec_implementation.pdf (last visited Apr. 29, 2018) (incorporating by reference *DNSSEC Practice Statement for the Root Zone ZSK operator*, ICANN & VERISIGN (May 28, 2010), *available at* http://www.root-dnssec.org/wp-content/uploads/2010/06/vrsn-dps-00.txt (last visited May 7, 2018)).

zone, and circumvent U.S.G. approval thereof, without Defendant Verisign. *See supra* §36.

38. The Plaintiff, on behalf of the U.S.G., asks the Court to grant a temporary restraining order, preliminary injunction, and/or permanent injunction against the termination of Federal Contract No. SA1301-12-CN-0035, also known as the IANA Functions Contract, due to misrepresentative and fraudulent acts conducted by principals of ICANN; a p a temporary restraining order, preliminary injunction, and/or permanent injunction against the termination of Cooperative Agreement No. NCR-92-18742, also known as the Verisign Cooperative Agreement, due to the misrepresentative and fraudulent acts by ICANN and Verisign, Inc.; and in the interest of justice award $1,771,516,680 (3 times the aggregate amount of application fees ($357,050,000.00) plus net auction fees ($233,455,563.00)) in addition to a maximum adjusted civil penalty award under the False Claims Act, 31 U.S.C. §3729(a)(1), which imparts liability for treble damages and a fine onto any business entity who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government", *id.*, at (G), or conspires to do so, *id.*, at (C).

## Parties

39. Plaintiff, █████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
████████████████████████████

40. Defendant, Internet Corporation for Assigned Names and Number, Inc. ("ICANN"), is a not-for-profit organization exempt from taxation according to 26 U.S.C. §501(c)(3),

and incorporated in the State of California with its principal place of business in the city of Los Angeles. According to its its stated purpose, ICANN "operate[s] for the benefit of the Internet community as a whole . . ."[103] "with participants from all over the world dedicated to keeping the Internet secure, stable and interoperable."[104] Among other things, ICANN was the U.S.G. contractor responsible for the coordination and management of the Internet's Domain Name System ("DNS") from 1998 to 2016. ICANN is currently performing those same duties under a federal contract that was closed-out on October 1, 2016, but has not yet terminated.

41. Defendant, Verisign, Inc. ("Verisign"), is a for-profit corporation, incorporated in the State of Virginia with its principal place of business and worldwide headquarters in the city of Reston. According to its stated purpose, "Verisign ensures the security, stability and resiliency of key internet infrastructures and services, including the .com and .net top-level domains and two of the internet's root serves, as well as performs the root zone maintainer function for the core of the internet's Domain Name System (DNS)."[105] Among other things, since 1993, Verisign has been and is currently the manager of the authoritative root zone of the DNS—proliferating .com, .net and all other gTLDs, globally—under a cooperative agreement with the United States Department of Commerce's ("DOC") National Telecommunications and Information Administration ("NTIA") (the "Verisign Cooperative Agreement"). The Verisign Cooperative Agreement is currently planned

---

[103] ICANN, Articles of Incorporation §4 (Sep. 30, 1998).

[104] *Get Started*, ICANN, https://www.icann.org/get-started (last visited Apr. 30, 2018).

[105] *Company Information—Who We Are*, Verisign, https://www.verisign.com/en_US/company-information/index.xhtml (last visited Apr. 30, 2018).

to be discharged as management of the Internet is being privatized through the "IANA Stewardship Transition," however, the DOC has reserved "the right to conduct a public interest review prior to November 30, 2018."[106]

## Jurisdiction and Venue

42. This Court enjoys subject matter jurisdiction over this action under 28 U.S.C. §1332(a)(1) because the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

43. This Court enjoys personal jurisdiction over the Defendants because they purposefully availed themselves of the rights and privileges of Georgia by soliciting and conducting business within the state, and the Plaintiff is and remains a resident of Georgia.

44. This Court enjoys venue under 28 U.S.C. §1391(b)(3) as the Defendants are subject to the personal jurisdiction of Georgia and no other venue would be appropriate.

## Statement of Facts

45. Plaintiff incorporates by reference into this Statement of Facts all of the allegations appearing in sections 1-44 of this complaint.

46. During the period between January 12, 2012 and May 30, 2012, Defendant ICANN held an open application period for The New gTLD Program. Reportedly 1,930 applications were submitted and accepted during this period, each requiring an application fee of $185,000.00, for an aggregate total of approximately

---

[106] *Supra* note 64, AMEND. 34 p.1 (Oct. 20, 2016), *available at* https://www.ntia.doc.gov/files/ntia/publications/amendment_34.pdf (last visited Apr. 30, 2018).

$357,050,000.00 in application fees received by Defendant ICANN.[107] Before,

during, and after the application period Defendant ICANN made representations

that ICANN "is responsible for introducing new generic top-level domains"[108] and

expressly warranted that "ICANN is . . . able to create TLDs as delegations in the

DNS root zone . . . ."[109] These representation and warranties made by Defendant

ICANN, at all times during the application period, relied upon "the administration of

certain responsibilities associated with Internet DNS root zone management"[110]

contracted to Defendant ICANN by the U.S.G. through the NTIA via Federal

Contract No. SA1301-06-CN-0048 ("0048"), also known as the IANA Functions

Contract.

47. Under the terms of 0048,

> "If the Contractor intends on establishing and collecting
> fees from third parties (i.e., other than the Government) for
> the functions performed under this contract, the Contractor
> shall notify the Contracting Officer in writing at least sixty
> days prior to the fee being applied and provide
> documentation which identifies the rationale for the fee, the

---

[107] There is a discrepancy of approximately 161 applications and associated fees of approximately $29,785,000.00 that ICANN originally said it received, and the amount ultimately reported. *Compare, e.g., New gTLD Launch—How to prepare for Reveal Day*, VALIDEUS, May 24, 2012, https://valideus.com/news/new-gtld-launch (last visited May 2, 2018) ("ICANN has announced that there are 2,091 applications in the TAS [("TLD Application System")], and an additional 214 reserved slots which have **yet to be paid for**") (emphasis added), *and* William Jackson, *ICANN kicks off Internet's largest expansion in history*, GCN, Jun. 12, 2012, https://gcn.com/articles/2012/06/12/icann-new-gtld-reveal-day.aspx (last visited May 2, 2018) (stating that as of the May 30, 2012 application window closing, there were "2,091 applications submitted or in progress"), *with supra* note 98 (stating that as of Apr. 30, 2018 there has been a total of 1,930 applications submitted).

[108] ICANN, New gTLD Program—Factsheet (Oct. 9, 2009), *available at* https://archive.icann.org/en/topics/new-gtlds/factsheet-new-gtld-program-oct09-en.pdf (last visited May 2, 2018).

[109] ICANN, GTLD APPLICANT GUIDEBOOK §1.2.5 (June 4, 2012), *available at* https://newgtlds.icann.org/en/applicants/agb/guidebook-full-04jun12-en.pdf (last visited May 2, 2018).

[110] IANA functions, NTIA, https://www.ntia.doc.gov/category/iana-functions (last visited May 2, 2018).

> parties to be charged, and the cost basis for the fee in accordance with OMB Circular A-122 and FAR clause 52.215-2, Audit and Records — Negotiations, Alternate II. The Contracting Officer shall approve any fee in writing prior to the Contractor imposing the fee."[111]

48. Accordingly, under the terms of 0048, Defendant ICANN was required to notify the Contracting Officer about fees intended to be accepted under The New gTLD Program, with the other contractual requirements, before November 14, 2011; and a Contracting Officer was to approve the acceptance of any fees, in writing, before Defendant ICANN began accepting fees on January 12, 2012.

49. While there is evidence that Defendant ICANN finalized budgetary guidelines for The New gTLD Program by October 21, 2010,[112] there is no evidence that said guidelines were submitted or approved by a warranted Contracting Officer for NTIA Federal Contract No. SA1301-06-CN-0048 before ICANN started accepting fees on January 12, 2012. Furthermore, Plaintiff has access to express affirmations from the DOC, NTIA and SBA that a warranted Contracting Officer did not oversee the IANA Functions Contract during the duration of The New gTLD Program (i.e., neither Federal Contracts Nos. SA1301-06-CN-0048 nor SA1301-12-CN-0035).

### COUNT I: REVERSE FALSE CLAIM
### (DEFENDANTS ICANN AND VERISIGN)

50. Plaintiff incorporates by reference into this Count all of the allegations appearing in section 1-49 of this complaint.

---

[111] *Supra* note 96, at §B.1(d).

[112] ICANN, *New gTLD Program Explanatory Memorandum—New gTLD Budget* (Oct. 21, 2010), *available at* https://archive.icann.org/en/topics/new-gtlds/explanatory-memo-new-gtld-program-budget-22oct10-en.pdf (last visited May 7, 2018).

51. Between January 12, 2012 and May 30, 2012, Defendant ICANN received approximately $357,050,000.00, *supra* note 107, through The New gTLD Program, which advertised and utilized functions awarded to Defendant ICANN through the IANA Functions Contract (Federal Contract No. SA1301-06-CN-0048).

52. Within The New gTLD Program, qualified applicants vying for the same gTLD could become registry operators via auction. To date, Defendant ICANN has received approximately $233,455,563.00 in net auction proceeds.

53. A warranted Contracting Officer over Federal Contract No. SA1301-06-CN-0048 did not approve of the application fees prior to acceptance thereof, or the auction process, as required under the federal contract.

54. Under both the federal contract at issue, SA1301-06-CN-0048, and the current IANA Functions Contract, SA1301-12-CN-0035, three parties are required to add new gTLDs to the authoritative root zone: The NTIA and Defendants ICANN and Verisign. The Root Zone Administrator, NTIA, never delegated/approved any new gTLDs under The New gTLD Program to be added to the authoritative root zone. Defendant Verisign thus circumvented the governing federal contract and its incorporated procedure and conspired with Defendant ICANN in the addition of the 1,230 new gTLDs added to the authoritative root zone.

### Temporary Restraining Orders

### REQUEST I: TRO AGAINST TERMINATION OF FEDERAL CONTRACT NO. SA1301-12-CN-0035 (DEFENDANT ICANN)

55. Plaintiff incorporates by reference into this Request for a Temporary Restraining Order all of the allegations appearing in sections 1-54 of this complaint.

56. At all times during the collection of fees under The New gTLD Program and the un-administered addition of new gTLDs to the authoritative root zone, Defendant ICANN was the U.S.G. contractor responsible for the management of the DNS under federal contracts SA1301-06-CN-0048—effective August 11, 2006 through September 30, 2012[113]—and SA1301-12-CN-0035. *Id.*

57. Aside from the malfeasance by principals of ICANN leading to the U.S.G. granting ICANN management of the DNS since 1998, *see, generally*, §1-38, ICANN committed materially false statements and omissions to both the U.S. House of Representatives and U.S. Senate in 2011, in violation of 18 U.S.C. §1001(c)(2), regarding the 2012 New gTLD Program, including, but not limited to:

    57.1. *Materially false statements regarding anticipated size of the applicant pool.*

        Kurt Pritz, Senior Vice President of Stakeholder Relations for ICANN, gave Congressional testimony before the U.S. Senate and U.S. House of Representatives on December 8, 2011 and December 14, 2011, respectively.[114] Under direct questioning from committee members in both Congressional hearings, Mr. Pritz was specifically asked—multiple times in

---

[113] *Compare* UNITED STATES NAT'L TELECOMM. AND INFO. ADMIN., AMEND. OF SOLICITATION/ MODIFICATION OF CONTRACT, CONTRACT NO. SA1301-06-CN-0048 p.2 (Mar. 5, 2012), *available at* https://www.ntia.doc.gov/files/ntia/publications/sa1301-06-cn-0048_mod_0010_executed.pdf (last visited Nov. 29, 2018) ("Period of Performance is hereby extended for a period of six (6) months from March 31, 2012 to September 30, 2012") *with* UNITED STATES NAT'L TELECOMM. AND INFO. ADMIN., AWARD/CONTRACT, CONTRACT NO. SA1301-12-CN-0035 p.1 (Oct. 1, 2012), *available at* https://www.ntia.doc.gov/files/ntia/publications/sf_26_pg_1-2-final_award_and_sacs.pdf (last visited Nov. 29, 2018) (stating that the effective date of the contract is "10/01/2012"—the day after the expiration of contract 0048, under which all monies for The New gTLD Program were collected).

[114] *ICANN's Expansion of Top Level Domains: Hearing Before the S. Comm. on Commerce, Science, and Transportation*, 112th Cong. 112-394 (Dec. 8, 2011); *ICANN's Top-Level Domain Name Program: Hearing Before the Subcomm. on Communications and Technology of the H. Comm. on Energy and Commerce*, 112th Cong. 112-107 (Dec. 14, 2011).

each hearing—about ICANN's anticipated size of The New gTLD Program's applicant pool. Such questioning was imperative to committee members discerning whether the $185,000.00 application fee was excessive in light of ICANN's expenditures. Under oath, Mr. Pritz initially stated to the Senate committee that only 300-500 applications were anticipated.[115] However, under scrutiny, Mr. Pritz increased the amount to "maybe slightly over 1,000" applications. *Id*. On December 14, 2011—before the House subcommittee— Mr. Pritz was questioned by Congressman Stearns as to whether "2,000 [applications] is a fair estimate," to which Mr. Pritz on behalf of ICANN replied emphatically "I don't think so. It think it is **much less** than that."[116]

Contrary to Mr. Pritz's Congressional statements under oath, Rod Beckstrom—ICANN President and CEO from August 16, 2011 to June 30, 2012—publicly acknowledged that ICANN anticipated as many as a "few thousand" New gTLD Program applicants as early as Sep. 22, 2011[117]— approximately 11 weeks prior to Mr. Pritz's Congressional testimony.

---

[115] *Supra* note 114, *ICANN's Expansion of Top Level Domains*, at 48.

[116] *Supra* note 114, *ICANN's Top-Level Domain Name Program*, at 159. (emphasis added)

[117] Board Briefing Materials No. Three — Special Meeting of the Board, ICANN, at 101 (Dec. 8, 2011), *available at* https://www.icann.org/en/system/files/bm/briefing-materials-3-08dec11-en.pdf (last visited Nov. 28, 2018). The briefing materials for the special board meeting contains "A Sampling of ICANN News Media Clips" between Sept. 11, 2011 — Nov. 25, 2011. A German article, translated from German, attributes Rod Beckstrom with stating "the number of interested **applicants** [is] currently estimated between one hundred and some few thousand." (emphasis added)

57.2. *Materially false statements regarding $185,000 application fee imposed*.

Between June 4, 2009 and December 14, 2011—ICANN officials presented materially false statements in a minimum of four Congressional hearings regarding the $185,000 application fee imposed in The New gTLD Program as a cost-based fee.[118] Characterizing the $185,000 as a "cost-recovery fee" for an extensive evaluation process of gTLD applicants,[119] Congressional members were knowingly and purposefully misled by Defendant ICANN.

On October 24, 2008, Defendant ICANN released a "Draft Applicant Guidebook, with six explanatory memoranda", for public comment for 76 days.[120] This was the first time Defendant ICANN publicly announced that it was imposing a $185,000 application fee for The New gTLD Program—a 411% increase from the $45,000 fee imposed in ICANN's 2003 sponsored Top-Level Domains (sTLDs) program, under which ICANN received significant public backlash that it attempted to avoid in the 2012 New gTLD Program.

---

[118] *Supra* note 114; *Oversight of the Internet Corporation for Assigned Names and Numbers (ICANN): Hearing Before the Subcomm. on Communications, Technology, and the Internet of the H. Comm. on Energy and Commerce*, 111th Cong. 111-42 (June 4, 2009); *and ICANN Generic Top-Level Domains (gTLD): Hearing Before the Subcomm. on Intellectual Property, Competition, and the Internet of the H. Comm. on the Judiciary*, 112th Cong. 112-37 (May 4, 2011).

[119] *Supra* note 114, *ICANN's Top-Level Domain Name Program*, at 159.

[120] ICANN, NEW GTLD DRAFT APPLICANT GUIDEBOOK VERSION 3, at 1 (Feb. 15, 2010), *available at* https://archive.icann.org/en/topics/new-gtlds/summary-analysis-agv3-15feb10-en.pdf (last visited Nov. 29, 2018).

57.2.1. *Past is Prologue.* In the 2003 sTLDs program—between June 23-24, 2003[121]—ICANN publicly released a draft Request for Proposal (RFP) for new sTLDs that limited applications to those that applied in its initial 2000 gTLD program, *supra* §29, and required a $25,000 nonrefundable application fee.[122] No public announcement was made by ICANN on limiting the applicant pool to the 2000 gTLD applicants prior to the draft sTLD RFP.[123] Once the RFP was released, ICANN suppressed public outcry by changing its email address—designated for public comments—listed in the RFP, to another unpublicized email address within 24 hours.[124] It appears that this deliberate action was taken as commenters were openly

---

[121] *Compare* Generic Top-Level Domain, ICANNWIKI, https://icannwiki.org/Generic_top-level_domain (last visited Dec. 15, 2017) (stating that the sTLDs RFP was released on June 23), *with* email from George Nagel, to ICANN (June 25, 2003 12:04:28 PM), *available at* https://fourm.icann.org/mtg-cmts/stld-rfp-comments/general/msg00025.htrnl (last visited Dec. 13, 2017) (stating that the RFP was released on June 24).

[122] *See, e.g., supra* note 121, ICANNWIKI; *see also* email from Bob Jacobson, SRI International, to ICANN (June 24, 2003 10:32:31 PM), *available at* https://forum.icann.org/mtg-cmts/stld-rfp-comments/general/msg00024.html (last visited Dec. 13, 2017) ("I believe the $25,000 application fee is unnecessary, redundant, and possibly discouraging to former applicants.").

[123] *See, e.g., supra* note 121, Email from George Nagel, to ICANN.
"I am writing to express shock and outrage at ICANN's decision to limit consideration of the new stud's [sic] to only the October 2000 applicants. There was no mention in either the Amsterdam or Rio meetings that would suggest that such a limitation was being considered."

[124] Email from Edward Hasbrouck, to ICANN (June 26, 2003, 2:13:13 PM), *available at* https://forum.icann.org/mtg-cmts/stld-rfp-comments/general/msg00027.htm (last visited Dec. 13, 2017) (stating that the listed draft RFP was changed from canada@icann.org to an unpublicized stld-rfp-comments@icann.org).

discussing that ICANN was limiting the applicant pool solely to self-deal.[125]

The minutes of the June 26, 2003 ICANN regular board meeting—held immediately after accusations of self-dealing emerged—reflect the first time that Defendant ICANN's Board discusses whether the "new round for creation of sTLDs should be limited to those proposals from 2000."[126] While ICANN ultimately opened the 2003 sTLD program to any interested party, the minutes from ICANN's 9 board meetings held between June 26, 2003 and December 13, 2003 are devoid of any rationale for Defendant ICANN increasing the application fee from $25,000 to $45,000 in ICANN's revised RFP released December 15, 2003.[127]

57.2.2. *2003's increase in application fees defy recommendations*.

Beginning immediately after the completion of ICANN's 2000 gTLD program, which increased ICANN's bottom-line by 50%, *supra* §29, ICANN's Board began discussing its next round of TLD applications

---

[125] *Id*.

> "The only apparent plausible explanation for restricting the RFP is a desire to favor one or more of the unsuccessful 2000 applicants. There have been persistent, credible, rumors of cronyism, favoritism, and back-back-from deals by ICANN staff and Board members throughout the new TLD application, selection, and approval process, in 2000 and continuing to date."

[126] Minutes — Regular Meeting of the Board, ICANN (June 26, 2003), *available at* https://www.icann.org/resources/board-material/minutes-2003-06-26-en (last visited Nov. 28, 2018).

[127] *See, generally*, 2003 Board Meetings, ICANN, *available at* https://www.icann.org/resources/pages/2003-2012-02-25-en (last visited Nov. 30, 2018).

on March 31, 2001. Within two months, on June 4, 2001, a New TLD Evaluation Process Planning Task Force (NTEPPTF) was decided upon by the Board to be chaired by ICANN's President and CEO—Dr. M. Stuart Lynn (March 2001 to March 2003).[128] One year later, the NTEPPTF submitted a report to the ICANN Board essentially providing an evaluation schedule and recommending an evaluation team be assembled in coordination with the acceptance of new gTLD proposals.[129] "Subsequently on August 23, 2002, the ICANN Board directed ICANN President Lynn to create an action plan regarding the NTEPPTF report." *Id*. Within three months, on October 18, 2002, an action plan was created and submitted to Defendant ICANN's Board that recommended using the same plan used in 2000, with an application cost reduction for previous applicants who reapplied. *Id*.

Accordingly, the increase from the initially set application fee of $25,000 for reapplying applicants from the 2000 program, to $45,000 for all applicants including those reapplying, could not have been based on technical evaluation processes and associated costs. Rather, as indicated by sTLD RFP comments posted prior to ICANN using suppressive tactics, the substantial increase in cost was likely used as a means to discourage applications in an effort to self-

---

[128] Minutes — Regular Meeting of the Board, ICANN (June 4, 2001), *available at* https://www.icann.org/resources/board-material/minutes-2001-06-04-en (last visited Nov. 30, 2018).

[129] *See, e.g.*, *supra* note 121, ICANNWIKI.

deal.[130] This effort seems to have worked as only 10 applicants applied for sTLDs by the time the application period ended on March 16, 2004[131]—accounting for an applicant pool of only 5% the size as compared to the 200 applicants that applied in 2000. However, unlike the 2000 program where only 3.5% of the requested TLDs were awarded (7 out of 200 requested TLDS to 7 out of 47 applicants)[132]—80% of the requested TLDs in the 2003 program were awarded (8 out of 10 requested TLDs to 8 out of 10 applicants).[133]

57.2.3. *Similarly, profit and self-dealing drove the 2000 gTLD program*.

Prior to Dr. Jon Postel's death in 1998, Postel drafted a RFC in May 1996 that was never published—referred to as "Draft-Postel"— that proposed a means for him to obtain complete authority over the DNS and also a financial windfall.[134] Specifically, Draft-Postel proffered that IANA would become part of the ISOC—which Postel co-founded alongside its chair, Vint Cerf[135]—and that 50 new top-

---

[130] *Supra* notes 122-25.

[131] Minutes — Special Meeting of the Board, ICANN (Nov. 15, 2004), *available at* https://www.icann.org/resources/board-material/minutes-2004-11-15-en (last visited Nov. 30, 2018) ("Kurt Pritz, Vice President, Business Operations provided an update on the status of the process for each of the ten applicants."); *see also, supra* §31.

[132] *Supra* note 3, at 202-03.

[133] *See* New gTLD Program, ICANNWIKI, https://icannwiki.org/New_gTLD_Prgram (last visited Nov. 30, 2018).

[134] Jon Postel, New Registries and the Delegation of International Top Level Domains (May 1996), *available at* https://tools.ietf.org/html/draft-postel-iana-itld-admin-00 (last visited Dec. 15, 2017) [hereinafter Draft-Postel-00].

[135] *Supra* notes 45-47, and accompanying text.

level registries (similar to NSI, *supra* §18) would each control 3 TLDs, for a total of 150 new TLDs.[136] Each applicant would pay a $1,000 application fee, with awardees to pay $10,000 and 1% of its revenues, yearly, to go into a fund in case a registry collapsed and to pay the IANA for services rendered.[137] Draft-Postel was officially supported by the ISOC in June 1996 upon release of an updated version.[138] Questions immediately arose due to Draft-Postel's self-dealing,[139] the authority of Postel to unilaterally dictate fees to be charged,[140] and re-raised questions to IAB/ISOC's claimed authority.[141] However, in the 2000 gTLD program, the application fee was set to $50,000—more than 50 times the amount Postel, the authority on adding gTLDs to the DNS, recommended just 4 years prior.

Accordingly, just as Defendant ICANN did in the 2000 and 2003 TLD programs, Defendant ICANN imposed an application fee in the 2012 New

---

[136] *Id.*; *see also* MUELLER, *supra* note 3, at 130.

[137] Draft-Postel-00, *supra* note 134; *see also* MUELLER, *supra* note 3, at 130.

[138] *Compare* Draft-Postel-00, *supra* note 113 (displaying a publication date of May 1996), *with* Jon Postel, New Registries and the Delegation of International Top Level Domains (June 1996), *available at* https://tools.ietf.org/html/draft-postel-iana-itld-admin-01 (last visited Dec. 15, 2017) [hereinafter Draft-Postel-01] (publication date June 1996).

[139] MUELLER, *supra* note 3, at 136.

[140] *See* MUELLER, *supra* note 3, at 136.

[141] MUELLER, *supra* note 3, at 136.

gTLD Program, which despite ICANN's assertions to the contrary, is not reflective of a zero cost-recovery fee.

Just as it occurred in the 2003 program, *supra* §57.2.1., the ICANN Board spoke openly—as reflected in its December 11, 2008 minutes—after the backlash it received following the exorbitant $185,000 fee was announced on October 24, 2008. In fact, numerous ICANN Board members renounced the $185,000 application fee and ICANN's position that said fee was for the "recovery of up-front costs," as mindful Board members recognized, "[a]s a matter of economic cost analysis . . . [such a position] did not make sense . . . ."[142] In response to these concerns, Kurt Pritz reminded the Board "that historically gTLD fees have paid for nearly all of ICANN's budget," and suggested that until ICANN finds "alternate sources of revenue," such fees needed to be implemented. *Id*. Therefore, contrary assertions and/or omissions made by Pritz to Congress are materially false.

57.3. *Materially false statements regarding rationale for additional gTLDs.*

Beginning on or before October 13, 2003, ICANN Board members were aware that the 7 newly added gTLDs from the 2000 gTLD program were not

---

[142] Preliminary Report of Special Board Meeting, ICANN (Dec. 11, 2008) *available at* https://www.icann.org/resources/board-material/prelim-report-2-2008-12-11-en (last visited Nov. 30, 2018).

gaining traction from Internet users.[143] Accordingly, one can reasonably

ascertain that a limitless expansion of gTLDs would not afford the vast

majority of 2012 New gTLD Program awardees an economic return

commiserate with their time and expenditures. As stated by Daniel Jaffe on

behalf of the Coalition for Responsible Internet Domain Oversight, referring

to a letter presented to the DOC by Robert Hall—professor of economics at

Stanford University and the 2010 president of the American Economic

Association—"an unlimited expansion of gTLDs would not add anything

material to the product variety facing Internet users. It would merely create a

costly nuisance for those users."[144] Despite this apparent knowledge,

express assertions by ICANN were made to Congress indicating

otherwise,[145] and as objectively reflected via the 32% attrition rate of New

gTLD Program applicants to date.[146]

58. Upon termination of Federal Contract No. SA1301-12-CN-0035, the IANA Functions

Contract, the transition of key DNS managerial functions will pass to ICANN. Once

said transition occurs, the U.S.G. will no longer have authority over those functions,

---

[143] Minutes — Special Meeting of the Board, ICANN (Oct. 13, 2003), *available at* https://www.icann.org/resources/board-material/minutes-2003-10-13-en (last visited Nov. 28, 2018). "Board members voiced concerns that many of the TLDs created during the 2000 round were still struggling with **myriad acceptance** and distribution issues, and that these issues should be carefully examined and addressed to the extent possible prior to considering the creation of new TLDs on a large-scale basis." (emphasis added)

[144] *ICANN's Top-Level Domain Name Program*, *supra* note 114, at 161-62.

[145] *See, e.g.*, *ICANN's Top-Level Domain Name Program*, *supra* note 114, at 28. Kurt Pritz states gTLDs issued through the New gTLD Program will excite and create value for Internet users.

[146] *Supra* note 96 (stating that 619 out of 1930 New gTLD Program applications have been withdrawn, despite the $185,000 nonrefundable application fee).

which are instrumental to the infrastructure and performance of the Internet—a U.S.

Critical Infrastructure Information System—and will cause irreparable harm to the

U.S. Government if ICANN's past malfeasance is indicative of its future practices.

59. As this complaint is filed under seal in accordance with 6 U.S.C. §133, and to

ensure the uninterrupted performance of the Internet, Plaintiff respectfully requests

a Temporary Restraining Order against the termination of Federal Contract No.

SA1301-12-CN-0035.

## REQUEST II: TRO AGAINST CLOSE-OUT AND TERMINATION OF FEDERAL COOPERATIVE AGREEMENT NO. NCR-92-18742 (DEFENDANT VERISIGN)

60. Plaintiff incorporates by reference into this Request all of the allegations appearing

in sections 1-59 of this complaint.

61. Upon termination of Federal Cooperative Agreement No. NCR-92-18742, the

Verisign Cooperative Agreement, the transition of key DNS managerial functions will

pass to ICANN. Once said transition occurs, the U.S. Government will no longer

have authority over those functions, which are instrumental to the infrastructure and

performance of the Internet—a U.S. Critical Infrastructure Information System—and

will cause irreparable harm to the U.S. Government if ICANN's past malfeasance is

indicative of its future practices.

62. As this complaint is filed under seal in accordance with 6 U.S.C. §133, and to

ensure the uninterrupted performance of the Internet, Plaintiff respectfully requests

a Temporary Restraining Order against the close-out and termination of Federal

Cooperative Agreement No. NCR-92-18742.

## Preliminary Injunctions

### REQUEST III: PRELIMINARY INJUNCTION AGAINST TERMINATION OF FEDERAL CONTRACT NO. SA1301-12-CN-0035 (DEFENDANT ICANN)

63. Plaintiff incorporates by reference into this Request all of the allegations appearing in sections 1-62 of this complaint.

64. Upon termination of Federal Contract No. SA1301-12-CN-0035, the IANA Functions Contract, the transition of key DNS managerial functions will pass to ICANN. Once said transition occurs, the U.S.G. will no longer have authority over those functions, which are instrumental to the infrastructure and performance of the Internet—a U.S. Critical Infrastructure Information System—and will cause irreparable harm to the U.S.G. if ICANN's past malfeasance is indicative of its future practices.

65. As this complaint is filed under seal in accordance with 6 U.S.C. §133, and to ensure the uninterrupted performance of the Internet during the evaluative period of the allegations contained herein, Plaintiff respectfully requests a Preliminary Injunction against the termination of Federal Contract No. SA1301-12-CN-0035.

### REQUEST IV: INJUNCTION AGAINST CLOSE-OUT AND TERMINATION OF FEDERAL COOPERATIVE AGREEMENT NO. NCR-92-18742 (DEFENDANT VERISIGN)

66. Plaintiff incorporates by reference into this Request all of the allegations appearing in sections 1-65 of this complaint.

67. Upon termination of Federal Cooperative Agreement No. NCR-92-18742, the Verisign Cooperative Agreement, the transition of key DNS managerial functions will pass to ICANN. Once said transition occurs, the U.S.G. will no longer have authority over those functions, which are instrumental to the infrastructure and performance

of the Internet—a U.S. Critical Infrastructure Information System—and will cause irreparable harm to the U.S.G. if ICANN's past malfeasance is indicative of its future practices.

68. As this complaint is filed under seal in accordance with 6 U.S.C. §133, and to ensure the uninterrupted performance of the Internet during the evaluative period of the allegations contained herein, Plaintiff respectfully requests a Preliminary Injunction against the termination of Federal Cooperative Agreement No. NCR-92-18742.

## **Permanent Injunctions**

### REQUEST V: PERMANENT INJUNCTION AGAINST TERMINATION OF FEDERAL CONTRACT NO. SA1301-12-CN-0035 (DEFENDANT ICANN)

69. Plaintiff incorporates by reference into this Request all of the allegations appearing in sections 1-69 of this complaint.

70. Upon termination of Federal Contract No. SA1301-12-CN-0035, the IANA Functions Contract, the transition of key DNS managerial functions will pass to ICANN. Once said transition occurs, the U.S.G. will no longer have authority over those functions, which are instrumental to the infrastructure and performance of the Internet—a U.S. Critical Infrastructure Information System—and will cause irreparable harm to the U.S. Government if ICANN's past malfeasance is indicative of its future practices.

71. As public awareness of the facts contained in this complaint—and the associated systemic impropriety Defendants ICANN and Verisign have jointly performed to enable ICANN to gain full control of the Internet—will irreparably injure the public trust associated with the technological system upon which we are all reliant, and

potentially fragment the Internet, *supra* note 55, and accompanying text, Plaintiff

respectfully requests, in the interest of the public, a Permanent Injunction against

the termination of Federal Contract No. SA1301-12-CN-0035 to ensure the

uninterrupted performance of the Internet.

### REQUEST VI: INJUNCTION AGAINST CLOSE-OUT AND TERMINATION OF FEDERAL COOPERATIVE AGREEMENT NO. NCR-92-18742 (DEFENDANT VERISIGN)

72. Plaintiff incorporates by reference into this Request all of the allegations appearing
in sections 1-71 of this complaint.

73. Upon termination of Federal Cooperative Agreement No. NCR-92-18742, the

Verisign Cooperative Agreement, the transition of key DNS managerial functions will

pass to ICANN. Once said transition occurs, the U.S. Government will no longer

have authority over those functions, which are instrumental to the infrastructure and

performance of the Internet—a U.S. Critical Infrastructure Information System—and

will cause irreparable harm to the U.S. Government if ICANN's past malfeasance is

indicative of its future practices.

74. As public awareness of the facts contained in this complaint—and the associated

systemic impropriety Defendants ICANN and Verisign have jointly performed to

enable ICANN to gain full control of the Internet—will irreparably injure the public

trust associated with the technological system upon which we are all reliant, and

potentially fragment the Internet, *supra* note 55, and accompanying text, Plaintiff

respectfully requests, in the interest of the public, a Permanent Injunction against

the termination of Federal Cooperative Agreement No. NCR-92-18742 to ensure the

uninterrupted performance of the Internet.

## Prayer for Relief

75. Plaintiff demands (i) a temporary restraining order against the termination of Federal Contract No. SA1301-12-CN-0035, also known as the IANA Functions Contract; (ii) a temporary restraining order against the close-out and termination of Cooperative Agreement No. NCR-92-18742, also known as the Verisign Cooperative Agreement; (iii) a preliminary injunction against the termination of Federal Contract No. SA1301-12-CN-0035, also known as the IANA Functions Contract; (iv) a preliminary injunction against the close-out and termination of Cooperative Agreement No. NCR-92-18742, also known as the Verisign Cooperative Agreement; (v) a permanent injunction against the termination of Federal Contract No. SA1301-12-CN-0035, also known as the IANA Functions Contract, in the interest of justice; (vi) a permanent injunction against the close-out and termination of Cooperative Agreement No. NCR-92-18742, also known as the Verisign Cooperative Agreement, in the interest of justice; and (vii) a declaratory judgement that The New gTLD Program relied upon, and thus was conducted under, the IANA Functions Contract—Federal Contract No. SA1301-06-CN-0048.

76. Plaintiff demands judgment against Defendants, jointly and severally, as follows: (viii) an award of $1,771,516,680 (3 times the aggregate amount of application fees ($357,050,000.00) plus net auction fees ($233,455,563.00)) in addition to a maximum adjusted civil penalty award under the False Claims Act, 31 U.S.C. §3729(a)(1); (ix) both pre-judgment and post-judgment interest on the award; and, (x) such other and further relief as this Court finds just and equitable.