FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUL 03 2019

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MARK S. GRAVES,<br><br>Plaintiff,<br><br>v.<br><br>INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS, INC., and<br><br>VERISIGN, INC.,<br><br>Defendants. | Civil Action No.<br>1:18-CV-5482-LMM<br><br>Filed under seal and *ex parte* as to defendants, per 31 U.S.C. § 3730(b) |

---

## Memorandum of Law in Support of the United States of America's Motion to Dismiss

This case was filed on behalf of the United States of America, but the United States believes this case lacks merit and will not result in any recovery. Allowing this case to proceed would waste the resources of the government (which would have to monitor the case), the resources of the Court (which would have to preside over the case), and the resources of the defendants (who would have to defend the case). Additionally, this case could interfere with an important government objective. Instead, this case should be dismissed.

1

Mark Graves filed this action under the False Claims Act, 31 U.S.C. §§ 3729–3733. That Act imposes treble damages on persons who, among other things, knowingly present false claims to the United States or knowingly avoid an obligation to pay money to the United States. *See id.* § 3729(a). Under the Act, private parties (known as "relators") may file actions on behalf of the United States. *Id.* § 3730(b). These actions are filed under seal so that the government can investigate before the defendants become aware of the allegations or the relator's identity. *Id.* § 3730(b)(2). If the action goes forward, relators are entitled to a share of the proceeds of any judgment or settlement. *Id.* § 3730(d).

The False Claims Act also provides the United States with the right to dismiss cases initiated on its behalf. *Id.* § 3730(c)(2)(A). To obtain dismissal, the government must notify the relator "of the filing" of the motion to dismiss, and the court must "provide[] the person with an opportunity for a hearing on the motion." *Id.* (The government previously notified Graves of its intent to move to dismiss, and Graves indicated that he may oppose the motion.) When evaluating motions to dismiss where the relator objects, courts have developed two competing standards. One line of cases holds that the government has an "unfettered" right to dismiss, while another line of cases holds that the government must provide a "valid" and "rational" reason to dismiss. Both lines

2

of cases recognize that the government should, as a matter of prosecutorial discretion, generally be able to control which cases are brought in its name.

This memorandum explains why this case should be dismissed, and it proceeds in three parts. First, this memorandum summarizes the relator's complaint, which alleges, in essence, that the defendants violated a government contract by charging and retaining fees from third parties. Second, this memorandum states the standards that apply to the government's motion to dismiss under 31 U.S.C. § 3730(c)(2)(A). There are two competing standards, but both are quite deferential to the government's decision. Third, this memorandum explains why it is in the government's best interests for this case to be dismissed. In short, the premise of the complaint is flawed. Although the complaint accuses the defendants of charging fees that were forbidden by a government contract, the contract did not actually prohibit that conduct. The contract concerned a different subject, unrelated to the program under which the defendants charged the fees. Allowing this case to proceed would waste government resources and could potentially interfere with the important governmental objective of transferring certain Internet administrative responsibilities to private control.

For these reasons, the government respectfully asks the Court to enter an order dismissing this case under 31 U.S.C. § 3730(c)(2)(A).

## Summary of Complaint

The relator is Mark Graves, a licensed Georgia attorney. Graves filed his complaint *pro se* and paid his filing fee a few weeks later.[1] (Dkt. 1, 8.)

The complaint's introduction states that the case is being filed under the False Claims Act, 31 U.S.C. § 3729(a)(1). (Compl. ¶ 1.) Much of the complaint consists of a history of the Internet, which was initially developed as a Department of Defense research project but has slowly transitioned to non-government control over the years. (*Id.* ¶¶ 15–20.) Graves does not allege that he was involved in any of the events at issue. All of his sources appear to be public documents.

### A. The IANA Functions Contract

The complaint concerns a critical part of the Internet's structure known as the Domain Name System. The Domain Name System operates as a type of address book that allows users to enter alphanumeric addresses (like "google.com") instead of the actual numerical IP address assigned to a specific website (like "172.217.7.4"). (*Id.* ¶ 6.) This address book must be updated and published

---

[1] Graves also moved to amend his complaint and attached a draft amended complaint as an exhibit. (Dkt. 6.) The Court denied that motion as moot, presumably because Graves could amend freely under Federal Rule of Civil Procedure 15. (Dkt. 11.) Graves never filed the amendment, so the original is still operative.

regularly. The set of administrative responsibilities that ensure the continued stable, secure functioning of the Domain Name System are collectively referred to as the Internet Assigned Numbers Authority Functions (the "IANA Functions").

For decades, it has been a bipartisan policy goal of the United States to transition the IANA Functions to private control.[2] This transition has been managed by the National Telecommunications and Information Administration ("NTIA") under the Department of Commerce. (Compl. ¶ 3.)

In 2000, the NTIA contracted with the Internet Corporation for Assigned Names and Numbers, Inc. ("ICANN"), a private non-profit company, to perform the IANA Functions. (*Id.* ¶ 28.) The contract was renewed in 2006 and again in 2012, but it expired in 2016 when the responsibility for performing the IANA Functions permanently transitioned to ICANN. Although the complaint does not attach a copy of the contract or mention its expiration, the document is central to the complaint and this Court may consider it when deciding the current motion. *See SFM Holdings, Ltd. v. Banc of Am. Sec., L.L.C.*, 600 F.3d 1334, 1337 (11th Cir.

---

[2] *See generally* United States Department of Commerce, Statement of Policy on Management of Internet Names and Addresses (Jun. 5, 1998), *available at* https://www.ntia.doc.gov/federal-register-notice/1998/statement-policy-management-internet-names-and-addresses (last visited Apr. 5, 2019).

2010). Courtesy copies of the 2006 and 2012 contracts are attached to this motion as Exhibits A and B, respectively.[3]

The complaint alleges that the IANA Functions contract forbade the service provider, ICANN, from charging any fees to any third parties without written advanced approval from the relevant government contracting officer. (Compl. ¶ 32; *see also* Ex. A § B.1(d); Ex. B § B.2.) The complaint further alleges that the contracting officer never authorized ICANN to collect any fees under this contract. (Compl. ¶ 34.)

### B. The New-gTLD Program

The complaint alleges that, beginning around 2000, ICANN and others developed a plan to create new generic top-level domains—referred to as the "new-gTLD program."[4] (*Id.* ¶ 33.) A top-level domain is the rightmost part of an Internet address, the part after the last period—*e.g.*, ".com" and ".gov". As part of this plan, ICANN sought applications from entities interested in operating

---

[3] The NTIA's website contains a detailed history of the contract, includes copies of the original agreement and its various extensions. *See* NTIA, IANA Functions Contract, https://www.ntia.doc.gov/page/iana-functions-purchase-order (last visited Apr. 8, 2019).

[4] ICANN's website contains general information regarding the new-gTLD program. *See* ICANN, New Generic Top-Level Domains, About the Program, https://newgtlds.icann.org/en/about/program (last visited May 7, 2019).

new top-level domains and charged application fees to those applicants. (*Id.* ¶ 29.) If multiple applicants sought the same top-level domain, ICANN held an auction to determine which entity would operate the new top-level domain and collected the auction proceeds from the winner. (*Id.* ¶ 33.) According to the complaint, ICANN earned more than $590 million in revenue from these application fees and auction proceeds. (*Id.* ¶¶ 33–34.) The complaint further alleges that co-defendant Verisign, Inc., was a necessary party and co-conspirator in this program. (*Id.* ¶ 2.)

Importantly, creating new generic top-level domains was *not* one of the IANA Functions, although the complaint sometimes gives that impression by describing both activities in the same paragraph. (*See, e.g., id.* ¶ 46 (stating that ICANN made representations during the new-gTLD program that "relied upon" ICANN's status as the party performing the IANA Functions).) The IANA Functions contract does not mention the new-gTLD program, and the complaint does not identify any other government contract under which the new-gTLD program might have been administered. In fact, the new-gTLD program was not a government program at all. Rather, the decision to create new top-level

domains was made by ICANN's board of directors, in accordance with the multi-stakeholder model of governance that drives ICANN's decision-making.[5]

### C. The Relief Sought by the Complaint

The complaint seeks damages as well as injunctive relief.

As to damages, the complaint seeks to recover monetary penalties under the False Claims Act. The primary theory in support of this claim is that ICANN violated the IANA Functions contract by collecting more than $590 million in fees and auction proceeds under the new-gTLD program. (Compl. ¶¶ 33–34.) The complaint alleges, without support, that ICANN should have transferred this money to the government. (*Id.* ¶ 35.) The complaint seeks treble damages of more than $1.77 billion under this theory. (*Id.* ¶ 38.) Separately, the complaint suggests that the award of the IANA Functions contract was induced by fraud. (*See, e.g., id.* ¶ 28 (defendants' false statements "objectively perpetuat[ed] fraud in the inducement of the IANA Functions Contract.")) This inducement theory is

---

[5] *See generally ICANN's Expansion of Top Level Domains: Hearing Before the S. Comm. on Commerce, Sci. and Transp.*, 112th Cong. 1–6 (2011) (testimony of Fiona M. Alexander, Associate Administrator, Office of International Affairs, National Telecommunications and Information Administration, United States Department of Commerce), *available at* https://www.ntia.doc.gov/speechtestimony/2011/testimony-associate-administrator-alexander-icann-s-expansion-top-level-domains (last visited Apr. 5, 2019).

not repeated in the "claims" section of the complaint (¶¶ 50–54), and the complaint does not specify what damages, if any, are being sought under such a theory. In any event, the first IANA Functions contract was signed in 2000, so the statute of repose has long passed on any inducement-based claims. *See* 31 U.S.C. § 3731(b) (ten year statute of repose). The rest of this memorandum will focus only on the first theory: the improper fees.

As to injunctive relief, the complaint seeks a temporary restraining order, a preliminary injunction, and a permanent injunction preventing the termination of the IANA Functions contract. (Id. ¶¶ 55–76.) The complaint does not explain the statutory basis for any injunctions. No motions seeking such relief have been served on the United States. Even if such motions were filed, they would be too late. As mentioned above, the complaint fails to disclose that the contract closed out in October 2016, and all of the IANA Functions were privatized at that time. This privatization was a contentious event—some Senators threatened a government shutdown to stop it and four State Attorneys General filed a lawsuit seeking to enjoin it—but that issue was settled in September 2016 when a court allowed the transfer to proceed. *See Ariz. v. Nat'l Telcoms. & Info. Admin.*, No. 3:16-cv-274, 2016 WL 9307615, 2016 U.S. Dist. LEXIS 191901 (S.D. Tx. Oct. 3, 2016).

9

## Legal Authority: Dismissal Under the False Claims Act

When a relator files a complaint under the False Claims Act, the government has four basic options. It can:

- intervene in the case and take over primary responsibility for litigating, 31 U.S.C. § 3730(b)(4)(A),

- decline to intervene, in which case the relator proceeds with the action subject to the government's supervision, *id.* § 3730(b)(4)(B),

- dismiss the case, *id.* § 3730(c)(2)(A), or

- settle the case, *id.* § 3730(c)(2)(B).

The statute does not explicitly provide for any judicial review of the government's decision to dismiss. Rather, the applicable subparagraph says simply that the government "may dismiss the action" as long as the relator has notice of the motion and the court provides the relator with "an opportunity for a hearing on the motion." *Id.* § 3730(c)(2)(A). The text does not list any other standards or conditions that apply to the government's decision. In comparison, the subparagraph authorizing the government to settle a case over the relator's objections provides for a fairness hearing. *Id.* § 3730(c)(2)(B). The absence of such standards in the dismissal subparagraph suggests that no such standards apply. *See United States ex rel. Ayers v. BondCote Corp.*, No. 4:03-cv-11, 2004 WL 7330782,

at *4, 2004 U.S. Dist. LEXIS 33074, at *10 (S.D. Ga. Aug. 20, 2004) (contrasting the dismissal and settlement language).

Recognizing this clear statutory text, some courts have said that the government has an "unfettered" right to dismiss, not subject to any judicial review. *E.g., Swift v. United States*, 318 F.3d 250, 252–53 (D.C. Cir. 2003).[6] The *Swift* court relied on the Executive Branch's "historical prerogative" to decide which cases should go forward in the name of the United States. *Id.* at 253. Other courts have applied a modicum of scrutiny to the government's decision, to ensure that the government has a "valid" and "rational" reason to dismiss. *E.g., United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998); *see also Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 935 (10th Cir. 2005) (following *Sequoia*). But even the *Sequoia* court emphasized that the courts may not place an additional burden on the Executive's exercise of prosecutorial

---

[6] District Courts in the Fifth and Eighth Circuits have predicted, based on statements made in *dicta*, that their circuit courts of appeals would adopt the *Swift* standard. *See United States ex rel. Sibley v. Delta Reg'l Med. Ctr.*, No. 4:17-CV-053, 2019 WL 1305069, at *5, 2019 U.S. Dist. LEXIS 48150, at *12 (N.D. Miss. Mar. 21, 2019); *United States ex rel. Davis v. Hennepin Cty.*, No. 18-CV-01551, 2019 WL 608848, at *5, 2019 U.S. Dist. LEXIS 23482, at *14 (D. Minn. Feb. 13, 2019).

11

discretion beyond that "mandated by the Constitution itself" in every case. *Sequoia*, 151 F.3d at 1146.

The Court of Appeals for the Eleventh Circuit has not chosen between these two standards, but that court has noted, in *dicta*, that the False Claims Act "does not prescribe a judicial determination of reasonableness" as to dismissals. *See United States v. Everglades Coll., Inc.*, 855 F.3d 1279, 1288 (11th Cir. 2017). Regardless, under either approach, the courts are very deferential to the government's decision to dismiss. In fact, no circuit court of appeals has ever sustained a relator's objection to the government's request to dismiss.

## Argument

Here, dismissal is appropriate because the government believes that the allegations in the complaint fail to state a valid claim under the False Claims Act and because this case could potentially interfere with the government's long-held goal of transferring the IANA Functions to private control. Under either of the two potentially applicable legal standards, these are sufficient reasons to dismiss.

Under the *Swift* standard, the government's desire to dismiss is sufficient, standing alone, to satisfy the statute. As the *Swift* court explained, the government has an "unfettered" right to select which cases to pursue. *Swift*, 318

F.3d at 252–53. The government respectfully suggests that the *Swift* standard is the appropriate standard.

Even if the Court applies the *Sequoia* standard, this case should still be dismissed. Under *Sequoia*, the government must first identify a "valid government purpose" and then show "a rational relation between dismissal and accomplish[ing] the purpose." *Sequoia*, 151 F.3d at 1145. Here, the government has at least two valid purposes that would rationally be served by dismissal:

*First*, the government has a valid interest in husbanding its resources instead of wasting them on a case with little merit. *See Sequoia*, 151 F.3d at 1146 (district court properly considered government's concern with litigation costs when granting motion to dismiss). If this lawsuit were to proceed, it would likely require the production of documents by the Department of Commerce and testimony from Department of Commerce witnesses. Lawyers from the Department of Justice would have to monitor the case and respond to discovery requests. If the government decides — as it has — that such costs are likely to outweigh any potential benefits, then it is rational for the government to invoke its right to dismiss. *See United States ex rel. Stierli v. Shasta Servs. Inc.*, 440 F. Supp. 2d 1108, 1114 (E.D. Cal. 2006) (relator's failure to "make any viable claim" is a legitimate reason for the government to seek dismissal); *Hennepin Cty.*, 2019 WL

13

608848, at *7, 2019 U.S. Dist. LEXIS 23482, at **19–21 (collecting cases where government's cost-benefit analysis provided reason to dismiss).

It is reasonable to think that dismissing this case will, on net, save the government from wasting resources—or, to use the *Sequoia* court's words, there is a "rational relationship" between dismissal and the "valid government purpose" of husbanding resources. In the current case, although the claimed damages are very high, the likelihood of recovering such amounts is vanishingly small. The primary error in the complaint is that it assumes ICANN collected the new-gTLD revenue *under* the IANA Functions Contract. Based on that assumption, the complaint argues that ICANN violated the contract and, therefore, the money it collected should have been "transferred to the [government] as required under [the IANA Functions Contract]." (Compl. ¶ 35.) Putting aside the unsupported conclusion in that sentence—why are the unauthorized fees owed to the government instead of back to the third parties?— the premise is flawed. ICANN did not conduct the new-gTLD program as part of the IANA Functions Contract. Rather, ICANN charged those fees under its own, independent new-gTLD program. The IANA Functions contract prohibited ICANN from charging fees to third parties (without prior approval of the contracting officer) when performing the IANA Functions. The contract did not

14

forbid ICANN from charging fees as part of its own programs, and it did not require ICANN to remit such fees to the government.

*Second*, the government has a valid interest in preventing interference with an important governmental objective. *See Ridenour*, 397 F.3d at 937 (possibility that lawsuit would divert the focus of government employees engaged in important project provided sufficient reason to dismiss). The United States has been working for more than twenty years to transfer control of the Internet to private hands. (*See* n.2, above.) To the extent the current suit seeks to block or unwind that transition, it conflicts with a long-held bipartisan policy goal. Dismissing this case would, conversely, further that goal.

## Conclusion

The government is chary of dismissing cases, but that option, cautiously exercised, is an important tool to advance the government's interests and preserve limited resources. Here, dismissal would further the government's goals of husbanding its resources and transitioning control of the Internet to private hands. As a matter of prosecutorial discretion, the government should be able to dismiss cases, like this one, that are brought in the government's name but are not in the government's interest. For these reasons, the United States respectfully asks the Court to dismiss the complaint under 31 U.S.C.

§ 3730(c)(2)(A) with prejudice as to the relator and without prejudice as to the United States.

The United States further requests that upon dismissal of the case, the Court lift the seal on Docket Nos. 1–11 and 13. Only the government's investigation summary (Dkt. 12) should remain under seal per 31 U.S.C. § 3730(b)(3).

Respectfully submitted,

BYUNG J. PAK
*United States Attorney*

*/s/ Anthony C. DeCinque*
ANTHONY C. DECINQUE
*Assistant United States Attorney*

Georgia Bar No. 130906
Anthony.DeCinque@usdoj.gov
600 U.S. Courthouse
75 Ted Turner Drive, S.W.
Atlanta, GA 30303
Ph: (404) 581-6000    Fx: (404) 581-6181

*Counsel for the United States of America*

## Certificate of Compliance

I hereby certify, pursuant to Local Rule 7.1(D), that the above motion to dismiss and memorandum of law was prepared in 13-point, Book Antiqua font.

_____
ANTHONY C. DECINQUE
*Assistant United States Attorney*

## Certificate of Service

I hereby certify that the above motion to dismiss and memorandum of law was served by mailing a copy by first class mail, with adequate postage affixed, addressed to:

Mark Stephens Graves
4155 Manor Hills Lane, SW
Atlanta, GA 30331-2043

*Relator, pro se*

These documents were not served on the defendants because this case remains under seal.

This 3rd day of July, 2019

_____
ANTHONY C. DECINQUE
*Assistant United States Attorney*